## Appeal of MANDEL BROTHERS.

Docket No. 1977. Decided July 23, 1926.

1. Taxpayer exchanged its capital stock for a mixed aggregate of tangible and intangible property. *Held*, that the amount thereof should be allocated to the classes of assets according to their cash value at the time paid in, and that the taxpayer may include in invested capital as paid-in surplus the excess of the actual cash value of the tangibles over the par value of the capital stock allocated thereto and good will to the extent of the par value of the stock allocated thereto, subject to the limitations. *Appeal of St. Louis Screw Co.*, 2 B. T. A. 649.

2. A sum paid to a prior tenant by the taxpayer in order to secure possession of certain property and charged to expense, may not be restored to surplus and included in invested capital for the taxable years in question.

3. Taxpayer expended certain sums in 1901 and 1902 in making improvements on leased premises under a lease expiring in 1918. This lease was superseded by a new lease agreement in 1906 requiring the taxpayer to tear down the old building and erect a new one. The unamortized cost of the improvements may not be spread over the term of the new lease, but is deductible as a loss in the year in which the improvements were demolished.

4. Amounts received by the taxpayer in 1913 and 1914 under a party-wall agreement represent a return of capital, thereby reducing its capital investment in the building.

5. The value of certain leaseholds as of March 1, 1913, can not be determined from the evidence submitted. An annual allowance for the exhaustion thereof is therefore denied.

6. Commissioner's determination that invested capital for the taxable years in question should be reduced on account of insufficient depreciation taken in prior years approved.

*George F. Von Kolnitz, Jr., Esq.*, for the petitioner.
*E. C. Lake, Esq.*, for the Commissioner.

Before MARQUETTE and MORRIS.

This is an appeal from a determination of deficiencies in income and profits taxes of $37,472.83, $92,609.23, $81,542.23, and $36,825.45, respectively, for the years 1917 to 1920, inclusive, aggregating $248,449.74.

Eight questions are presented by this appeal, as follows:

(1) Whether there should be included in invested capital, under the Revenue Acts of 1917 and 1918, subject to the limitations, the value of the good will of a partnership, transferred to the taxpayer in exchange for its capital stock.

(2) Whether the sum of $51,058.11, paid by the taxpayer to a prior tenant to secure possession of certain property, should, after proper deductions for exhaustion, be included in the taxpayer's invested capital.

(3) Whether the sum of $376,808.35, representing the amount expended by the taxpayer in remodeling a building upon leased land, should, after proper deductions for depreciation, be included in taxpayer's invested capital, when, as a condition to the execution of a new lease canceling the old one, the building was to be demolished and a new building erected at the lessee's expense.

(4) Whether the amounts referred to in (2) and (3) should be amortized over the term of the lease existing at the dates of the expenditures or over the term of the lease as extended by a new agreement.

(5) Whether the amounts received by the taxpayer in 1913 and 1914 from the owner of adjoining property, under a party-wall agreement, where the party wall was erected by the taxpayer at its expense, should be treated as reducing the taxpayer's investment in the building, or whether the amounts received constituted income of the years 1913 and 1914, and as such should be included in the taxpayer's surplus for invested capital purposes.

(6) Whether certain leaseholds owned by the taxpayer at March 1, 1913, had any values at that date which may be made the subject of deductions for exhaustion for the years involved in this appeal.

(7) Whether the taxpayer is entitled to an annual deduction on account of the exhaustion of the March 1, 1913, values of the lease-holds referred to in (6).

(8) Whether the taxpayer's invested capital, as shown on its books of account as of January 1, 1917, should be reduced in the amount of $771,573.70, on account of insufficient depreciation taken by the tax-payer in years prior to 1917.

### FINDINGS OF FACT.

The taxpayer, an Illinois corporation with its principal office at Chicago, was engaged, during all of the years in question, in the business of operating a department store in the aforementioned city.

For many years prior to 1898 there existed in Chicago a retail merchandise and department store business owned and operated by Leon Mandel, Emanuel Mandel, and Simon Mandel, as co-part-ners, under the firm name and style of Mandel Brothers. Desiring to separate the business of their department store from their other operations, the partners caused the incorporation of Mandel Broth-ers, the taxpayer herein, on May 4, 1898, with an authorized capital stock of a par value of $1,000,000, all of which, with the exception of three qualifying shares, was issued to the partners in exchange for the assets, including good will, of the department store business theretofore owned and conducted by them. The tangible assets, other than leaseholds, thus transferred were carried on the books of the partnership at an aggregate value of $1,762,629.18, which value has been recognized and approved by the Commissioner for the pur-pose of computing the taxpayer's invested capital. The leaseholds acquired by the taxpayer from the predecessor partnership were as follows:

(1) Lease from the Hovey estate of the premises then known as Nos. 121–123 State Street, Chicago, expiring August 31, 1915, at an annual rental of $25,000, which land was acquired by purchase prior to 1915.

(2) Lease from Marshall Field of the premises then known as Nos. 125–127 State Street, Chicago, expiring April 30, 1918, at an annual rental of $40,000 per year.

(3) Lease from Davis to Mackey of the premises then known as Nos. 111–113–115 Wabash Avenue, Chicago, expiring May 1, 1909, at an annual rental of $12,000 per year, which lease the said partner-ship had purchased from Mackey for the sum of $102,500 in cash.

In the computation of the taxpayer's invested capital for the tax-able years 1917 to 1920, the Commissioner has allowed a paid-in sur-plus of $48,241.81 in respect of the Marshall Field lease, and a paid-in surplus of $60,984 in respect of the Davis lease.

For the five calendar years immediately preceding taxpayer's organization, the net income of the partnership and the book value of the tangible property employed in the partnership business were as follows:

| Year. | Tangible property. | Net income. |
|---|---|---|
| 1893 | $1,275,563.83 | $322,353.77 |
| 1894 | 1,490,256.29 | 280,372.11 |
| 1895 | 1,640,998.84 | 410,569.42 |
| 1896 | 1,645,241.08 | 316,818.26 |
| 1897 | 1,796,371.75 | 293,384.58 |
| Average tangible property | 1,569,686.36 | |
| Average net income | | 324,699.83 |

The actual cash value of the good will acquired from the partnership was, at the date of acquisition, $600,000.

At the time the taxpayer acquired from the partnership the lease, hereinafter referred to as the Field lease, from Marshall Field, covering the premises then known as Nos. 125–127 State Street, said premises were occupied by a prior tenant. To secure possession of the premises and in liquidation of certain expenses the taxpayer paid to the then occupant the sum of $51,058.11, which it charged to expense on its books of account.

During the years 1901 and 1902, the taxpayer expended the total sum of $376,808.35 in remodeling the building standing upon the premises covered by the Field lease, all of which sum was charged to expense on the books of account.

When the Field lease was acquired by the taxpayer it had a remaining life of 20 years, less 4 days. On November 15, 1906, the taxpayer and representatives of the estate of Marshall Field agreed to the cancellation of this lease and entered into a new lease for a term of 99 years from May 1, 1908.

On January 27, 1903, the taxpayer entered into an agreement with Chas. A. Stevens & Co., the owner of property adjoining the premises occupied by the taxpayer, wherein and whereby each party agreed to pay ascertainable sums to the party first entering upon the construction of a new party wall, if the party not undertaking the construction of the wall should make use of it. This agreement pertained to any party wall which might be erected by either party upon the boundary or dividing line of Lots 4 and 5, Block 14, Fort Dearborn Addition to Chicago. On May 20, 1903, these parties entered into a similar agreement in respect of any party wall which might thereafter be erected by either party upon the boundary or dividing line of Lots 10 and 11, Block 14, Fort Dearborn Addition to Chicago. On August 11, 1913, and February 21, 1914, Chas. A. Stevens & Co. paid to the taxpayer the sums of $45,250 and $51,889,

respectively, in accordance with the terms of one or both of these agreements. The said sums of $45,250 and $51,889 were credited, respectively, on the taxpayer's books to accounts denominated "Wabash and Madison Investment" and "State Street Building".

At March 1, 1913, and during the taxable years in question, the department store building occupied by the taxpayer, located in the center of the retail business district of Chicago and situated on State Street, Madison Street and Wabash Avenue, consisted of sixteen floors above the ground and three floors below. It covered five separate lots of land and a public alley known as Holden Court, which ran from Madison Street right through the height of the first floor of the building with a width of 40 feet and a length of approximately 150 feet. Of the five lots comprising the land on which the building stood, two were owned in fee, and three, which will be hereinafter referred to as lots "A," "B" and "C," were held under three separate lease agreements, which will be referred to as the "Field" lease, the "Mandel" lease, and the "Davis" lease.

Lot "A," held under the Field lease, is situated at the corner of Madison and State Streets, being about 53 feet on the former and about 151 feet on the latter. It was leased to the taxpayer by the trustees under the last will and testament of Marshall Field, by an instrument dated November 15, 1906, for the term of 99 years from May 1, 1908, at an annual rental of $50,000 from May 1, 1908, to April 30, 1918, and a rental thereafter of $60,000 per annum. The taxpayer agreed to pay all water rates, taxes and assessments, general and special, ordinary and extraordinary, of every kind and nature, except income and inheritance taxes, levied or assessed upon the demised premises or upon any buildings or improvements at any time situated thereon; to rebuild or repair, within eighteen months, the building standing on the premises in the event it is damaged by fire or otherwise; to erect and construct upon the demised premises a mercantile or office building, not less than ten stories in height, of first-class, modern fire-proof construction, covering substantially the whole area of the premises, said building to be built upon caissons and to cost not less than $300,000, and to be completed and ready for occupancy not later than May 1, 1918; and to keep the then building standing on the premises insured for not less than $70,000, until the erection of the new building, and after the erection of the new building to keep the same insured at 80 per cent of its full insurable value. The lessors agreed that the taxpayer might have, without making any payment therefor, all materials of or wreckage from the old building standing on the premises, which was to be demolished.

Lot " B," held uder the " Mandel " lease, is situated to the north of Lot "A" on State Street, the two lots being separated by a lot which is owned by the taxpayer in fee. It has a frontage on State Street of about 48 feet and a depth to Holden Court of about 151 feet. It was leased to the taxpayer under an indenture dated November 13, 1909, for the term of 99 years from February 1, 1909, at an annual rental of $48,000. The taxpayer agreed to pay all water rates, taxes and assessments, general and special, ordinary and extraordinary, of every kind and nature, except income and inheritance taxes, levied or assessed upon the demised premises or upon any buildings or improvements at any time situated thereon; to rebuild or repair, within 18 months, the building standing upon the premises in the event it is damaged by fire or otherwise; to erect and construct upon the demised premises a mercantile or office building, not less than ten stories in height, of first-class, modern fire-proof construction, covering substantially the whole area of the premises, said building to be erected upon caissons and to cost not less than $300,000, and to be completed and ready for occupancy not later than May 1, 1918; and to keep the then building standing upon the premises insured for not less than $50,000, until the erection of the new building, and after the erection of the new building to keep the same insured at 50 per cent of its full insurable value. The lessors agreed that the taxpayer might have, without making any payment therefor, all materials of or wreckage from the old building standing on the premises, which was to be demolished.

Lot " C ", held under the Davis lease, is situated on Wabash Avenue, approximately 70 feet from the corner of Madison Street, having a frontage of about 72 feet and a depth to Holden Court of about 163 feet. It was leased to the taxpayer under an indenture dated May 1, 1900, for the term of 99 years from that date, at an annual rental to May 1, 1909, of $12,000, and $18,000 per annum thereafter. The taxpayer agreed to pay all taxes and assessments, water rates, special assessments, and all governmental impositions of any and every kind or nature whatsoever, levied or assessed upon the demised premises; to rebuild or repair, within two years, the building standing upon the premises in the event it is damaged by fire or otherwise; to erect upon the demised premises, on or before May 1, 1908, a new fire-proof construction modern building, not less than eight stories and basement in height, covering substantially the whole area of the premises; and to keep the building standing upon the premises insured to the amount of $75,000. The lessors agreed that all materials of and salvage from the building then standing on the premises should belong to the lessee.

The three foregoing leases were in existence and owned by the taxpayer at March 1, 1913, and during the taxable years in question.

In its income-tax returns for years prior to 1917, the taxpayer made deductions from income, on account of depreciation of buildings, in amounts computed at a uniform rate of 1 per cent. Similar deductions were made from income in the returns for the years 1917, 1918 and 1919, in amounts computed at a rate of 2 per cent, and for the year 1920 in an amount computed at a rate of 2½ per cent. The Commissioner has allowed deductions for all of the years in question, on account of depreciation of buildings, in amounts representing 2 per cent of their cost. For invested capital purposes, the Commissioner has computed the accumulated depreciation to January 1, 1917, by going back to the date of original acquisition of each asset and applying to the cost thereof, according to the straight-line method of depreciation, the same rates he has used in computing the deductions for the taxable years in question. The total depreciation credited to asset accounts on the taxpayer's books, in respect of all depreciable assets, to January 1, 1917, amounted to $1,040,162.66. The total accumulated depreciation to January 1, 1917, as computed by the Commissioner, is $1,809,508.55, an increase over the depreciation shown by taxpayer's books of $769,345.89.

Taxpayer's sales for the years 1898 to 1920, inclusive, were as follows:

| | | | | | |
|---|---|---|---|---|---|
| 1898 | $5,924,804 | 1906 | $9,960,318 | 1914 | $11,465,037 |
| 1899 | 7,086,768 | 1907 | 9,979,981 | 1915 | 11,155,180 |
| 1900 | 7,417,028 | 1908 | 9,525,541 | 1916 | 12,773,540 |
| 1901 | 8,806,016 | 1909 | 9,570,179 | 1917 | 13,976,185 |
| 1902 | 9,684,662 | 1910 | 10,396,517 | 1918 | 14,956,725 |
| 1903 | 9,777,184 | 1911 | 9,599,583 | 1919 | 20,992,116 |
| 1904 | 9,193,851 | 1912 | 9,813,543 | 1920 | 27,804,367 |
| 1905 | 9,107,392 | 1913 | 12,107,828 | | |

## OPINION.

MORRIS: The questions will be considered in the order in which they appear in our opening statement. The first question is whether the taxpayer is entitled to include in invested capital, subject to the limitations prescribed by the Revenue Acts of 1917 and 1918, good will acquired from the predecessor partnership for capital stock. The taxpayer acquired from the partnership, a mixed aggregate of tangible and intangible property for capital stock. The actual cash value at the date of acquisition of the tangible property, other than leaseholds, was, by the admission of the parties, $1,762,629.18. The Commissioner placed a value, as of the same date, upon the leaseholds of $109,225.81, to which no objection has been raised by the taxpayer. It will be noted from the schedule set out in our find-

ings of fact that for the five-year period immediately preceding the organization of the taxpayer company, the earnings of the partnership averaged $324,699.83, or an amount approximately $2,300 higher than the earnings of the first year of the five-year period. During three years of the five-year period the earnings were from $5,500 to $42,000 less than the first year of the period. The earnings of the fourth year were $94,000 less than those of the third year, and the earnings of the fifth year were $23,000 less than those of the fourth year, which would indicate that the earnings were decreasing at the time the taxpayer took over the partnership business. In contrast to that situation the tangible assets employed in the partnership business were increasing during the five-year period. From the low figure of the first year of $1,275,000 they increased to $1,796,000 in the fifth year. The tangible assets employed in the fifth year were approximately 140 per cent of those employed in the first year, while the earnings of the fifth year were approximately 91 per cent of those of the first year. The earnings of the first year represented a return of approximately 25 per cent on the tangibles, while the earnings of the fifth year represented a return of approximately 16 per cent.

In view of these facts, we are of the opinion that a capitalization of the average earnings, in excess of a return of 8 per cent on the tangibles, on the basis of a rate of 20 per cent, produces a result which is considerably in excess of the actual cash value of the good will at the date of acquisition. From the evidence before us we find that such value was not in excess of $600,000. The total of all the assets acquired from the partnership was, therefore, $2,471,854.99. For these assets the taxpayer issued its capital stock of a total par value of $1,000,000. The Commissioner assumes that the capital stock was first issued for the tangibles, and, since the value of the tangible property alone exceeded the par value of the capital stock issued for all the assets, he contends that the good will may not be included in invested capital, for to do so would result in the allowance of a paid-in surplus in respect of intangible property, which is not permitted by the Revenue Acts of 1917 and 1918. We had a similar situation under consideration in the *Appeal of St. Louis Screw Co.*, 2 B. T. A. 649. After consideration of the pertinent provisions of the Revenue Acts of 1917 and 1918, it was there held:

It is no more correct to say that the capital stock was issued for the tangibles than it is to say that it was issued for the patents and good will. * * * Inasmuch as the entire capital stock was specifically issued for three classes of assets, we think that the amount thereof should be allocated to the three classes of assets according to their cash value at the time paid in.

Following that conclusion, we held that the taxpayer was entitled, under the Revenue Acts of 1917 and 1918, to include in invested

capital, as a paid-in surplus, the excess of the actual cash value of the tangibles over the par value of the capital stock allocated thereto, and to include also, good will to the extent of the par value of the capital stock allocated thereto, subject to the limitations, applicable to intangibles, prescribed by the statutes. Allocating the capital stock issued by the taxpayer, for the assets of the partnership, in accordance with the rule laid down in *Appeal of St. Louis Screw Co.*, *supra*, we find the par value thereof issued for each of the two classes of assets to be as follows:

| Assets | Cash value at acquisition | Par value of stock issued therefor |
|---|---|---|
| Tangibles (including leaseholds) | $1,871,854.99 | $757,267.31 |
| Good will | 600,000.00 | 242,732.69 |
| Totals | 2,471,854.99 | 1,000,000.00 |

Accordingly, we hold that the taxpayer is entitled to include in its invested capital, for the years in question, the sum of $1,114,-587.68, representing the excess value of the tangibles over the par value of the capital stock issued therefor, and good will in the sum of $242,732.69, subject to the limitations, applicable to intangibles, prescribed by the statutes.

The second question relates to the proposition whether the taxpayer is entitled to restore to surplus and to include in invested capital, after proper deductions for exhaustion, the sum of $51,058.11, paid to a prior tenant to secure possession of certain property and for other expenses. As pointed out in our findings of fact, at the time the taxpayer acquired, by transfer from the partnership, the " Field " lease, covering the premises then known as Nos. 125–127 State Street, said premises were occupied by a prior tenant, and in order to secure possession thereof the taxpayer paid to said tenant the sum of $51,058.11, which it charged to expense on its books of account. The " Field " lease was to expire on April 30, 1918; but on November 15, 1906, the taxpayer and the representatives of the estate of Marshall Field agreed to the cancellation of this lease and entered into a new lease agreement for the term of 99 years from May 1, 1908. The taxpayer contends that the amount paid to the prior tenant was a capital expenditure which should have been recorded as such on its books and amortized on the basis of the remaining term of the original lease until November 15, 1906, the date of the new lease agreement, and the unamortized portion thereof at the latter date treated as a capital investment to be amortized over the period from November 15, 1906, to the date of expiration of the new lease agreement. The circumstances under which the prior tenant occu-

pied the premises at the time the taxpayer acquired the original lease have not been made known to us by any proper evidence. It is difficult, therefore, to deduce from the record the real character of this expenditure. Counsel for taxpayer stated at the hearing that the said amount was paid to a tenant, "who had the right to retain possession two years," and that the result of making said payment was "to give the taxpayer the right to enter into these premises two years earlier than he would otherwise." If this statement is correct, then, under the view most favorable to the taxpayer, the expenditure in question should have been written off over the two-year period, leaving nothing to be restored to surplus and included in invested capital for the years in question. Ordinarily an expenditure made in order to obtain possession of premises for a period prior to the time as of which the person making the payment will, of his own right, come into possession thereof, affords no benefits beyond the period for which the payment is made. It represents an amount paid for the right to enjoy the possession of the premises specifically for said period, and, therefore, an expenditure which must be amortized ratably over that period. This is not inconsistent with our decision in the *Appeal of The Columbia Theatre Co.*, 3 B. T. A. 622. In the latter case, the payment by the taxpayer to the sub-lessee was made in order that the taxpayer might enter into full possession of the premises for the purpose of commencing building operations to enable it to enjoy its lease for the full term thereof. The benefits following from such payment accrued to the taxpayer throughout the term of the lease. We therefore held that the amount paid to the sub-lessee constituted a cost in connection with the acquisition of the lease. In the case at bar, the payment to the prior tenant was made in order to secure possession of the premises for the purpose of carrying on the taxpayer's merchandising operations. The two cases are not analagous. Unless the prior tenant was entitled to occupy the premises during all or a part of the taxable years in question, no part of the total sum paid by the taxpayer to secure possession of the premises can be deemed to represent an expense of those years; hence there is nothing in respect thereof which the taxpayer would be entitled to include in invested capital as an unamortized expense. Since all the facts necessary to a disposition of this question in accordance with the foregoing principles have not been made known to us by proper evidence, we are unable to determine to what extent, if any, the taxpayer is entitled to include the amount in question in invested capital; hence we are forced to sustain the Commissioner's action in disallowing the whole amount as invested capital.

The third question is whether the taxpayer is entitled to include in invested capital, subject to proper deductions for depreciation, the

sum of $376,808.35, representing the amount expended by it in making improvements to the premises covered by the "Field" lease. These expenditures were made during 1901 and 1902, at a time when the original "Field" lease, expiring in 1918, was in effect. This lease was superseded by the lease agreement of November 15, 1906, the latter containing a covenant on the part of the taxpayer to tear down the building then standing on the premises and to erect a new building, the lessor agreeing that the taxpayer might take, without any payment therefor, all materials of and wreckage from the demolished building. These covenants on the part of the lessee were fully complied with prior to January 1, 1917. The expenditures making up the total sum in question were charged to expense on the books of account. The taxpayer contends that the sum in question constituted a capital expenditure which should have been recorded as such on its books of account and amortized on the basis of the remaining term of the original lease until November 15, 1906, the date of the new lease agreement, and the unamortized portion thereof at the latter date treated as a capital investment to be amortized over the period from November 15, 1906, to the date of the expiration of the new lease agreement. All of the improvements constructed, erected, installed, or however acquired by the taxpayer, through the expenditure in 1901 and 1902 of the total sum of $376,808.35, were demolished prior to January 1, 1917, in accordance with the agreement of November 15, 1906. The undepreciated or unamortized cost of these improvements at the date of their demolition does not constitute a part of the cost of the new lease. The taxpayer sustained a deductible loss in the year in which these improvements were demolished in an amount representing the unextinguished cost thereof. It is not entitled to include any amount in the invested capital of any of the taxable years in question in respect of such improvements. *Appeal of First National Bank of Evanston, Wyo.*, 1 B. T. A. 9; *Appeal of Wigwam Amusement Co.*, 1 B. T. A. 335.

Our conclusion with respect to the second and third questions necessitates a conclusion, in respect of the fourth, that the taxpayer is not entitled to amortize the amounts referred to over the term of the lease as extended by the new agreement of November 15, 1906.

The fifth question relates to the proper treatment of the amounts received by the taxpayer in 1913 and 1914 from Chas. A. Stevens & Co., the owner of adjoining property, under a party-wall agreement. The taxpayer contends that the amounts so received constituted income for the years 1913 and 1914 in the nature of rentals for the use of the wall; that it erroneously treated these transactions on its books by crediting the amounts so received to its building accounts; and that the amounts in question should be restored to the

building accounts and the earned surplus correspondingly increased for invested capital purposes. The Commissioner has held that these payments did not constitute income to the taxpayer, but represent a return of capital, thereby reducing the taxpayer's capital investment in the building. The relation of the parties to the party-wall agreement is to be determined by the law of Illinois. It is not one of lessor and lessee, but one of joint owners. *See Mickel* v. *York*, 175 Ill. 62; 51 N. E. 848; *Beidler* v. *King*, 209 Ill. 302; 70 N. E. 763; *Kuh* v. *O'Reilly*, 261 Ill. 437; 104 N. E. 5. *In Mickel* v. *York*, *supra*, the court stated:

But where a party wall is constructed on the line between adjacent lots, resting partly on each, by one of the lot owners, under a parol or written agreement, by which agreement the other owner agrees to pay one-half the value of the wall when he elects to use it, the builder of the wall owns it absolutely, with a permanent right in him and his grantees to have one-half the wall stand on the land of the other while the other retains title, and also after it has passed to an assignee with notice of the rights of the owner of the wall. If, however, by agreement, the owner of the lot who did not build the wall, has a right to elect to pay one-half its value and use the same, and he does so, he thereby becomes the owner of not only the one-half standing upon his own land, but has an easement in the other half, standing on the lot of the one who built the wall.

That principle received approval in the other two cases cited above. We hold that the Commissioner's treatment of the amounts so received by the taxpayer in 1913 and 1914, under the party-wall agreement, is correct.

The sixth question presented involves a determination of the March 1, 1913, value of three leases owned by the taxpayer at that date and during the taxable years in question. The taxpayer contends that these leases had an aggregate fair market value at March 1, 1913, of not less than $1,700,000, which it is entitled to amortize over the remaining terms of the leases from that date. The Commissioner denies that such leases had any fair market value at March 1, 1913, which may be made the subject of a deduction for exhaustion. In May, 1925, these leaseholds were made the subject of an appraisal by an appraisal company, and a value, as of March 1, 1913, was placed thereon by the latter, in the amount of $1,828,100. The employee of the appraisal company who conducted the appraisal was present at the hearing and was subject to the examination of both parties. The appraisal report was submitted in evidence only for the purpose of a chronological presentation of the facts and figures to which this witness would testify. His testimony demonstrated clearly that he was incompetent to give expert opinion as to value of real property in the loop district of Chicago, as of March 1, 1913, or any other date. He had no personal knowledge along this line. Whatever opinion he entertained as to the value of these

leaseholds at March 1, 1913, was the result of the working out of a formula adopted by the appraisal company for making valuations of this character. He was in no position to testify as to the accuracy of the result obtained by the use of such a formula. An executive officer of the appraisal company testified that he worked in collaboration with the appraiser in the preparation of the appraisal report, and that the formula used in arriving at the appraised value was the same one which is in general use by the company in the appraisement of real properties. The appraisal report itself evidences the use of erroneous factors in applying this formula, hence any opinion based thereon must be erroneous. Briefly stated, the application of this formula necessitates as a first step the ascertainment of the fair market value of the leased property at March 1, 1913. To obtain that value the appraiser determined the average ratio of assessed values to selling values in respect of certain properties which were sold or leased during the period July 1, 1910, to August 5, 1914. This average ratio was then applied to the assessed values of the lands leased by the taxpayer and the result obtained adopted as the fair market value of those lands at March 1, 1913. Upon such value provision was made for a return of 5 per cent, which was assumed to represent a fair rental for these properties at March 1, 1913. The difference between this assumed fair rental and the annual rentals stipulated in the lease agreements was deemed to represent the savings or earnings attributable to the leasehold, and treated as an annuity, the present worth of which at March 1, 1913, determined in accordance with Hoskold's Tables on the basis of a risk rate of 5 per cent, was adopted as the March 1, 1913, value of the leaseholds. When asked as to why he thought 5 per cent represented a fair rental return upon property in the loop district of Chicago at March 1, 1913, the appraiser replied, "It was found that money was borrowed on property at that time, at or near that time, at 5 per cent per year." But we have no reason to accept money rates as a criterion to what constitutes a fair rental on real properties. In the determination of the annual savings in rentals which will result through the ownership of these leaseholds, the appraiser has entirely disregarded the fact that the taxpayer was obligated, under the terms of the three leases, to erect three new buildings upon the leased premises, two of the leases providing that the new building should cost not less than $300,000. Further, if 5 per cent upon property values represents a fair return to the lessor who is relieved entirely of the burdens of management, upkeep, and maintenance of the property, certainly a risk rate of 5 per cent in the determination of the present worth at March 1, 1913, of the expected rental savings can not be considered as proper in the case of a lessee who undertakes to assume all such burdens. That the leaseholds

had a considerable value at March 1, 1913, seems certain. What that value was has not been proven by proper evidence.

The seventh question is whether the taxpayer is entitled to an annual deduction, in computing net income for income-tax purposes, on account of the exhaustion of the March 1, 1913, value of the leaseholds referred to above. The right of the taxpayer to make such deductions has been settled by the decision of this Board in the *Appeal of Grosvenor Atterbury*, 1 B. T. A. 169. Since the taxpayer has failed to establish by competent evidence the March 1, 1913, value of its leaseholds, we are unable to determine the amount of the deduction to which the taxpayer is entitled. Accordingly, we can not disturb the Commissioner's action in refusing to allow a deduction of this character in the computation of the net income for the taxable years in question.

The eighth and last question is whether the taxpayer's invested capital, as shown by its books of account as of January 1, 1917, should be reduced in the amount of $769,345.89, on account of insufficent depreciation taken in years prior to 1917. The petition sets forth that the reduction of invested capital made by the Commissioner on this account amounts to $771,573.70. The latter amount is the actual reduction made by the revenue agent, but the deficiency letter shows that the Commissioner revised the revenue agent's action to the extent of reducing the depreciation reserve computed by the agent and adding back to earned surplus the sum of $2,227.81.

The taxpayer contends that the entries shown upon its books are conclusive since no contradictory evidence was submitted by the Commissioner. It relies upon our decisions in *Appeal of Rub-No-More Co.*, 1 B. T. A. 228; *Appeal of Cleveland Home Brewing Co.*, 1 B. T. A. 87; and *Appeal of Russell Milling Co.*, 1 B. T. A. 194.

The taxpayer used upon its books a 1 per cent rate for the years prior to 1917, a 2 per cent rate for the years 1917, 1918, and 1919, and a 2½ per cent rate for 1920. It claimed that each respective rate, when applied to the cost values, constituted a reasonable allowance for the periods covered. In other words, for the years prior to 1917 the rate was predicated on a life for the buildings of 100 years, between 1917 and 1919 of 50 years, and for 1920 of 40 years. The only explanation given by the taxpayer for the 100 per cent increase in rate for 1917–1919 over the years prior to 1917 and the 25 per cent increase in rate for 1920 over 1917–1919, was that the wear and tear on the property increased *as evidenced by its sales increase.* That explanation is not satisfying. The mere volume increase in dollars of sales has no reference to the use of the property, in the absence of other evidence. The price increase and the depreciation of the dollar, during the years following 1913, are matters of common knowledge. The relative ratios are matters of record. It is quite

generally conceded that, between 1913 and 1920, there was an increase in prices, both at wholesale and retail, of over 100 per cent. The taxpayer's sales increased in dollars in substantially the same ratio, being $12,100,000 in 1913, and $27,800,000 in 1920. Certainly, in the absence of any evidence of the comparative number of persons who visited the taxpayer's store during the years in question, or the increased number of articles sold over the counter, or how the actual use of the property caused greater deterioration, we can not say that a money increase in sales shows additional wear and tear on the property, but, rather, must deem the dollar increase in sales as merely normal and in conformity with the economic trend of the period. That evidence was the sole justification, voluntarily submitted by the taxpayer, for the use of a 2 per cent rate after 1917 as compared with 1 per cent prior thereto.

The Commissioner has determined that a 2 per cent rate for all of the years 1909 to 1920, is reasonable. The taxpayer has not rebutted the *prima facie* case by the mere production of its books. These show only that the return correctly reported the book entries. A line of reasoning which concluded that the presumption of the correctness of the Commissioner's determination is rebutted by the production of the very evidence which the Commissioner examined and found to reflect an unreasonable allowance and so found not from the books themselves, but from the surrounding circumstances, would be most peculiar. The Commissioner's allowance does not contradict the fact of what the books showed. It is the determination of a " reasonable allowance," and the burden is upon the taxpayer to rebut the presumption of the correctness of that determination.

None of the three decisions cited by the taxpayer state any different position.

In *Appeal of Cleveland Home Brewing Co.*, *supra*, there was affirmative evidence, other than the books, supporting the depreciation allowance. *In Appeal of Rub-No-More Co.*, *supra*, an appraisal corroborated the surplus shown upon the books. In *Appeal of Russell Milling Co.*, *supra*, there was evidence explaining the depreciation taken by that company upon its books and we found the same to be substantiated. On the other hand, in the present appeal there has been neither corroboration nor substantiation of the book entries. The taxpayer has told us that it used 2 per cent after 1917, as compared with 1 per cent prior thereto, and justified that solely by evidence of sales increase, to which reason we can give little if any weight. But the Commissioner *has found and determined* that a 2 per cent rate effects a reasonable allowance for the entire period. The taxpayer has not sustained the burden of showing wherein that determination was erroneous by proof that its books reflected a

proper and reasonable depreciation allowance over the years here involved. Accordingly, the action of the Commissioner in reducing the invested capital by $769,345.89 is approved. See, also, *Appeal of City National Bank*, 2 B. T. A. 623.

*Order of redetermination will be entered on 15 days' notice, under Rule 50.*