The Challenger, Inc.1 v. Commissioner. Challenger, Inc. v. CommissionerDocket Nos. 88427, 90742-90746.United States Tax CourtT.C. Memo 1964-338; 1964 Tax Ct. Memo LEXIS 1; 23 T.C.M. (CCH) 2096; T.C.M. (RIA) 64338; December 31, 1964*1 The Pub, Saratoga, and Waldorf leased slot machines to Challenger. All four were corporations owned by Graves. 1. Held: most of the slot machine lease payments are not deductible by Challenger as rent. Deductible amount determined. Sections 482, 162(a)(3), I.R.C. 1954. 2. Receipts by the Pub, Saratoga, and Waldorf of the disallowed "rent" payments do not, on the facts of this case, constitute taxable income to those corporations. 3. The Pub's surtax exemption properly disallowed under section 1551, I.R.C. 1954. 4. Revival of a dormant corporation does not constitute acquisition of control of a corporation under section 269, I.R.C. 1954. 5. Surtax exemptions may not be disallowed under section 482, I.R.C. 1954. 6. Payments by Challenger to Nugget Enterprises and by Nugget Enterprises under real property leases held deductible in entirety as rent. 7. Respondent upheld in disallowance of part of amounts paid by Twin Falls to Caldwell and Waldorf under real property leases. Graves owned Twin Falls and Caldwell, as well as the other corporations. 8. The year in which Caldwell received those disallowed "rent" payments not being before the Court, we need not determine whether those receipts *2 constitute taxable income to Caldwell. 9. Receipts by Waldorf of the disallowed "rent" payments do not, on the facts of this case, constitute taxable income to Waldorf. 10. Twin Falls acquired the use of property under leases involving high "rent" payments for the first year or two and low payments for the next 24 or 23 annual renewal terms. Held: the arrangements constituted deferred purchases of the property. 11. Excess of Twin Falls' payments over agreed cost of "leased" properties treated as deductible financing costs. Twin Falls paid an additional $7,000 to take title to those properties. Held: $7,000 payment constituted additional financing costs, not additional capital expenditures. 12. Respondent's determinations as to useful lives, salvage values, and probability of lease renewals upheld. 13. Useful lives of leasehold improvements do not extend past expiration of probable lease renewals. Held: taxpayer properly elected to depreciate its investment in the leasehold improvements on the double declining balance method. Section 1.167(c)-1(c), Income Tax Regs.Valentine Brookes and Paul E. Anderson, 1600 International Bldg., St. Mary's Square, San Francisco, Calif., for the petitioners. *3 Leon Yudkin, for the respondent. TRAINMemorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in income taxes as follows: FY EndedAmountThe Challenger, Inc., DocketNo. 884279-30-55$30,986.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,023.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,403.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,134.26The Pub, Inc., Docket No.907438-31-579,859.208-31-585,462.798-31-599,184.80Saratoga Club, Inc., DocketNo. 9074410-31-566,162.5810-31-576,142.4610-31-585,589.1810-31-598,899.71Caldwell Sport Shop, Inc.,Docket No. 907455-31-596,944.94United Waldorf, Inc., DocketNo. 907466-30-565,355.836-30-576,856.936-30-585,742.606-30-598,986.65By amended petitions in docket Nos. 90743 through 90746, the petitioners therein claim overpayments as follows: FY EndedAmountThe Pub, Inc., Docket No.907438-31-57$ 2,723.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,340.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,233.93Saratoga Club, Inc., DocketNo. 9074410-31-568,949.9510-31-578,495.3310-31-587,690.7010-31-5913,014.84Caldwell Sport Shop, Inc.,Docket No. 907455-31-591,950.00United Waldorf, Inc., DocketNo. 907466-30-5611,874.786-30-576,549.076-30-588,560.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,085.61 Respondent determined deficiencies in income taxes of Twin Falls Brunswick, Inc., as follows: FY EndedAmount8-31-55$30,256.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,538.24Period 9-1-56 to 5-31-57196.12*4 Respondent further gave notice that Carson City Nugget, Inc., docket No. 90742, was liable as transferee for the entire deficiencies of Twin Falls Brunswick, Inc. Carson City Nugget, Inc., first admitted, but by amended petition denied, its asserted transferee status. That issue has been severed for trail at a later date if we should hold that there are deficiencies in income taxes of Twin Falls Brunswick, Inc. The abovelisted dockets have been consolidated for trial and briefing as to all other issues. The issues remaining for decision are: 1. Whether respondent properly allocated to the Challenger certain slot machine income reported as rent income by the Pub, Saratoga, and Waldorf and deducted as rent expense by the Challenger; 2. If so, whether the taxable incomes of the Pub, Saratoga, and Waldorf should be reduced by the amounts allocated to the Challenger; 3. Whether the Pub, Saratoga, and Waldorf are entitled to surtax exemptions; 24. Whether respondent properly disallowed portions of the rent deductions taken by the Challenger and Nugget Enterprises with regard to realty leased by them; 5. Whether respondent properly disallowed a portion of the rent deductions taken by Twin *5 Falls with regard to realty leased by it from Caldwell and, if so, whether such receipts are includible in Caldwell's income; 6. Whether respondent properly disallowed a portion of the rent deductions taken by Twin Falls with regard to realty leased by it from Waldorf and, if so, whether such receipts are includible in Waldorf's income; and 7. Whether respondent properly disallowed a portion of the rent deductions taken by Twin Falls with regard to property acquired by it under leases. Findings of Fact Some of the facts have been stipulated and are hereby found as stipulated. The Challenger, Inc., Twin Falls Brunswick, Inc., Saratoga Club, Inc., Caldwell Sport Shop, Inc., and United Waldorf, Inc. (hereinafter sometimes referred to as "the Challenger," "Twin Falls," "Saratoga," "Caldwell," and "Waldorf," respectively), were incorporated in Idaho on December 18, 1947. The Pub, Inc., (hereinafter sometimes referred to as "the Pub") was incorporated in Idaho on December 12, 1947. Carson City Nugget, Inc., is a Nevada corporation with its principal place of business in Carson City, Nevada. *6 It is before the Court only as an alleged transferee of Twin Falls. For the years before us: all the Idaho corporations kept their books and records on an accrual basis and filed their income tax returns with the district director of internal revenue at Reno, Nevada; Twin Falls had its principal place of business in Carson City, Nevada; the other corporations had their principal offices or places of business in Sparks, Nevada; and Caldwell filed its returns for taxable years ending on May 31, Waldorf on June 30, Twin Falls and the Pub on August 31, the Challenger on September 30, and Saratoga on October 31. Richard L. Graves (hereinafter sometimes referred to as "Graves") owned all the outstanding stock of the Challenger since December 14, 1954, of Twin Falls from February 15, 1954, through September 5, 1956, of the Pub since September 20, 1950, of Saratoga since December 21, 1949, and of Waldorf since December 15, 1953. From its incorporation until December 14, 1954, the Challenger's stock was held equally by Graves and W. L. Winn, who at one time had also held stock in all the other corporations. From December 29, 1948, until December 15, 1953, Graves held two of Waldorf's three *7 outstanding shares of stock. Since May 24, 1948, Graves owned two of Caldwell's three outstanding shares and his wife, Flora Graves (hereinafter sometimes referred to as "Flora"), owned the third. During the years before us, (until October 1, 1956, in the case of Twin Falls) Graves was president and manager of all the Idaho corporations. On September 5, 1956, Graves sold all his Twin Falls stock to Carson City Nugget, Inc., for not less than the fair market value of Twin Falls' assets. On or about October 1, 1956, Carson City Nugget, Inc., completely liquidated Twin Falls, receiving all its assets. The Challenger operated a cocktail lounge and slot machines in Boise, Idaho, from 1948 until slot machines were made illegal in Boise. The Challenger then transferred its operations to Sandpoint, Idaho. It discontinued its Idaho operations in 1953. Twin Falls operated a cigar store in Twin Falls, Idaho, and a sporting goods store in Kimberly, Idaho. Both stores had slot machines. Twin Falls discontinued both businesses in Idaho in 1953. The Pub operated a beer tavern and slot machines in Boise, Idaho. About 1951, when slot machines were made illegal in Boise, the Pub's business was closed *8 down and its equipment put in storage. The Pub was not in business thereafter until its 1954 taxable year in Nevada. Saratoga operated a small club, including a restaurant, a bar, and slot machines, in Caldwell, Idaho. Caldwell sold beer and sporting goods and operated a cigar store, a restaurant, a coffee shop, and slot machines in Caldwell, Idaho. It discontinued operations when slot machines were outlawed in the town of Caldwell, about December 31, 1950, and thereafter did no business in Idaho. Waldorf operated a cigar store with food, sporting goods, and slot machines in Nampa, Idaho. Each of these businesses involved slot machines, the operation of which was legal under local option at the time, and each business was closed down when slot machines were made illegal in the relevant locality or by action of the Idaho Supreme Court. State v. Village of Garden City, 74 Ida. 513, 265 P. 2d 328 (1953). When the business assets were thereafter sold, the corporations retained their slot machines and certain restaurant equipment, which were later moved to Nevada. On February 20, 1954, Saratoga, Waldorf, and James H. Kelley (hereinafter sometimes referred to as "Kelley") purchased for *9 $15,000 all the stock of a Reno, Nevada, corporation which was thereupon named Nugget, Inc. Hickok, the seller of the stock, assigned to Nugget, Inc., his leasehold interest in the property on which Nugget, Inc.'s business was conducted. Kelley and Graves guaranteed the payment of the leasehold purchase price. Nugget, Inc., opened for business on March 11, 1954. On January 1, 1955, Nugget, Inc.'s capital stock was held by Kelley (87 shares), Waldorf (43 shares), Saratoga (42 shares), and Graves (2 shares). On that date, Kelley bought the interests of the others in Nugget, Inc. Kelley agreed to: assume Graves' leasehold purchase guarantee obligation (the unpaid balance was approximately $90,000 on January 1, 1955); pay $3,750 each to Waldorf and Saratoga for their stock; pay $2 to Graves for his stock; pay Buhl Sport Shop, Inc., (a company in which Graves had an interest and which company was liquidated shortly after this transfer) the $20,000 it had lent to Nugget, Inc.; and pay Caldwell the $7,500 it had lent to Nugget, Inc. The payments to Waldorf and Saratoga and $5,000 of the payment to Caldwell were to be made by transferring 30, 30, and 40 slot machines, respectively, to those *10 corporations. The 40 slot machines were to be transferred to Caldwell by January 31, 1955. The 100 slot machines, rebuilt to Graves' specifications, were transferred to the respective corporations. Graves agreed to pay Lee Winn the $2,500 he had loaned to Nugget, Inc., and in exchange Kelley agreed to give Graves ten slot machines and $500 worth of slot machine parts by March 1, 1955. The Pub, Caldwell, Saratoga, and Waldorf entered into partnership with several individuals in June or July 1954 to operate the Westerner Club in Las Vegas, Nevada. Their investments were: the Pub - $28,084.50; Caldwell - $9,361.50; Saratoga and Waldorf - each $18,723. The Pub borrowed approximately $30,000 from an Idaho bank to obtain the funds to make its investment, all in cash, in the Westerner Club. All four corporations sold out their interests, receiving their investments back, on January 14, 1955. This partnership in the Westerner Club was the Pub's first Nevada business activity. Thereafter, until February 1, 1955, at least, the Pub was not actively engaged in business. On January 14, 1955, the Pub repaid $20,638.50 plus $59.91 interest on a loan from the Continental State Bank, and repaid $500 *11 on a loan from Caldwell. On January 19, 1955, the Pub loaned $5,000 to Oregon Train Cafe, Inc., another of Graves' corporations. On January 10 and February 11, 1955, Caldwell loaned $9,000 and $13,000 to the Challenger. On February 1, 1955, Caldwell transferred to the Pub the 40 slot machines it had received from Kelley. The $5,000 transfer price, not paid by the Pub until November 10, 1955, equaled Caldwell's cost for the machines and also the machines' fair market value at the time of the transfer to the Pub. On September 25, 1954, the Challenger leased premises in Sparks, Nevada, about three miles east of Reno. In March 1955, it opened on those premises a bar, restaurant, and casino known as the Sparks Nugget. On March 17, 1955, the slot machines acquired from Kelley were owned by the Pub (40 machines), Saratoga (30 machines), and Waldorf (30 machines). On that day, the Challenger leased those machines from those three corporations for an indefinite term, cancelable on 30 days' notice, for operation in the Sparks Nugget. The Challenger agreed to pay each of those corporations 15 percent of the net from those slot machines after jackpot pay-offs, to furnish the necessary licenses *12 for the machines and to keep them in good repair. The net was computed as that which remained in the machines after payouts during play, less: jackpots paid by the owner of the premises, the cost of slot machine licenses, and the amount of coins invested in the machines at the start of their operation. Nevada gambling casinos that rented slot machines during the period before us on this issue normally did so on the following terms: the lessor of the slot machines would advance the money for licenses and starting coins; the lessor would maintain and repair the machines and secure the necessary licenses (Annual maintenance costs might exceed the cost of the machines. Federal, state, county, and local licenses were a major item of expense, totaling about $450 per machine per year, approximately equal to the cost of a new machine.); the lessor would recover its advance for the cost of licenses before splitting the net take of the slot machine; if the machine failed to earn the advance for licenses, the risk of loss was upon the lessor; 50 percent of the net would go to the owner-lessor of the slot machines and 50 percent to the lessee, who controlled the premises where the machines would *13 be located. Sometimes the machines' lessor would accept less than 50 percent where a large number of machines was leased to one location. When as many as 50 machines were leased to one location, the lessor might get as little as 25 percent of the net. Waldorf leased slot machines on the usual 50-50 basis to two locations in Carson City, Nevada, in 1954 or 1955. Establishments as large as the Challenger generally bought their own slot machines, rather than leasing them from others, because such machines were lucrative parts of the business in such establishments. Slot machines were commonly adapted for use at different locations. When they would be transferred from one location to another it would be usual to rewire them, change reel strips, and adjust percentage of payout to the requirements of the new location. Although the slot machines went into operation in the Challenger's Sparks Nugget on March 17, 1955, no lease payments were made until late in 1955. The first payment to Waldorf, $14,245.56, was made on December 14, 1955. On January 18, 1956, Waldorf lent $20,000 to the Challenger. The next slot machine payment to Waldorf, $18,957.87, was made on September 14, 1956. In November *14 1956, Waldorf lent $5,000 to the Challenger. The first slot machine lease payment to Saratoga, $14,245.56, was made on December 14, 1955. The second payment, $30,263.26, was made on November 8, 1956. On November 10, 1956, Saratoga lent $30,000 to the Challenger. The first slot machine lease payment to the Pub, $18,994.08, was made on November 12, 1955. On November 10, 1955, a check for $5,000 was drawn in favor of Caldwell for the purchase of the slot machines. The second payment of slot machine lease payment to the Pub, $26,285.38, was made in November 1956. On November 8, 1956, the Pub lent $15,000 to the Challenger. The Challenger did not make monthly payments under the slot machine lease until some time in 1957. The income payable to the three companies by the Challenger, as recorded in the ledgers and accounts of the Challenger and actually paid to the three companies, was not based upon the actual income earned by the slot machines leased to the Challenger. The amounts deducted by the Challenger for the payments to the three companies usually did not correspond to the amounts reported by the companies as income during the respective periods. The Challenger received payments for *15 slot machines as follows: Date ofNumber ofPay-PurchaserCheckMachinesmentSaratoga12-20-5511$2,855.80Waldorf12-20-55102,596.20Saratoga1-28-566750.00Waldorf1-28-567875.00The Pub1-28-567875.00During the years before us the Challenger acquired and used slot machines from entities other than the Pub, Saratoga, and Waldorf. In the deficiency notice to the Challenger, respondent determined that: the three related corporations listed below were availed of to avoid income tax, accordingly your taxable income is increased * * * [FYE September 30, 1955 - $37,256.81; 1956 - $90,359.27; 1957 - $80,620.41; 1958 - $93,129.16] to allocate income and deductions, attributed to you or to them to the entity earning and controlling the income. In making this increase in your taxable income consideration is given to section 61, section 269 and section 482 of the Internal Revenue Code . Under either or all of these sections of the Internal Revenue Code it is held that the three corporations referred to herein are to be disregarded in computing your tax liability, therefore, income, deductions and credits in the books and/or returns of such corporations as they pertain to your business are imputed to you. *16 * * * The following table compares the amounts of slot machine income respondent determined had been diverted from the Challenger to the Pub, Saratoga, and Waldorf; the amounts respondent determined to allow the Challenger to deduct as "depreciation on assets used by you but reflected in the returns of the related corporations"; the net adjustment increasing the Challenger's income; and the amounts deducted by the Challenger on its returns as slot machine rent to the Pub, Saratoga, and Waldorf: GrossDeducted byDivertedtheFYE 9-30IncomeDepreciationNetChallengerAdjustment1955$38,097.04$ 840.23$37,256.81$ 47,485.20195692,624.672,265.4090,359.2784,266.64195782,885.812,265.4080,620.4191,349.59195895,394.562,265.4093,129.16100,440.511959No deficiency notice97,336.07$420,878.01 The 100 slot machines which the Pub, Saratoga, and Waldorf acquired from Caldwell and Kelley were depreciable on the straight-line method over five years with a salvage value of $15 each. To the extent that the Challenger's payments to the Pub, Saratoga, and Caldwell under the slot machine lease agreements exceeded $2.59 per slot machine per month, the payments were not required to be made for the use of the slot machines *17 in the Challenger's business. The Pub reported the following amounts of slot machine income from the Challenger and other income on its Federal income tax returns for the years indicated: Slot MachineIncome fromFYEThe Chal-8-31lengerOther Income1955$14,812.80$ 2,197.48 (Westerner Club)195644,418.470195710,618.570195840,623.11(33.85)(Nugget Enterprises)195945,244.0314,268.77 (Nugget Enterprises)On its 1955 Federal income tax return, Caldwell reported gross income of $14,679.22 and deductions of $3,219.69. On May 1, 1957, Graves and Flora created four irrevocable trusts, each with a corpus of $6,000, one trust for each of their children. The First National Bank of Nevada (hereinafter sometimes referred to as "the Bank") was made trustee and given power to commingle the funds of the different trusts. On the same day the four trusts formed a joint venture called the Graves Children Trust No. 1. The joint venture bought eight houses and lots comprising half of a city block in Sparks, Nevada, for a total of $180,134.05. The Bank, in its own right, took a mortgage of $153,000 on the property. These houses were across the street from the Challenger's operations and were torn down. Also on *18 May 1, 1957, the Bank, as trustee, leased the lots to the Challenger for a ten-year term for use as a parking lot. Rent was fixed at $2,500 per month for the first year and was then to be renegotiated. On August 29, 1957, the Pub, Saratoga, Caldwell and Waldorf formed a joint venture called Nugget Enterprises to lease the premises then being leased by the Challenger, construct a building thereon, and rent out the same. The joint venturers adopted the calendar year as the joint venture's taxable year and agreed to share profits and losses equally. On September 23, 1957, the lease between the Bank, as trustee, and the Challenger was canceled. A new lease for the same premises was entered into on the same date between the Bank, as trustee, and Nugget Enterprises for 20 years at $3,750 per month for the first five years. The rent was to be renegotiated each five years. Nugget Enterprises had an option to renew for an additional ten years. The property was to be used for a gambling club, restaurant, and related facilities. By an agreement dated the same day, September 23, 1957, Nugget Enterprises subleased the same premises to the Challenger for ten years (with an option in the Challenger*19 to renew for another ten years) at $3,750 per month for the first seven months and $15,000 per month thereafter. The sublease provided that, "Unless [Nugget Enterprises] shall agree in writing to any other use of the demised premises, they shall be used only as a parking lot; * * *." It also provided that Nugget Enterprises "has caused to be contructed upon said premises a building. [The Challenger] wishes to sub-lease from [Nugget Enterprises] said premises together with all improvements thereon." Nugget Enterprises then constructed a building on these premises. It was completed on May 12, 1958, at a total cost, to the end of 1958, of $796,769.81. During the Challenger's taxable year ending September 30, 1958, it was required to pay $101,250 as rent to Nugget Enterprises for these premises. In the deficiency notice to the Challenger for that taxable year, respondent determined that: (a) Your taxable income is increased $15,000.00 as it is determined that a reasonable rental for the property [described above] * * * is $30,000.00 and not $45,000.00 as claimed in your return. In 1958 Nugget Enterprises paid $45,000 as rent to the Bank, as trustee, for these premises. In the deficiency *20 notices to the Pub, Saratoga, Caldwell, and Waldorf, respondent determined that: the joint venture, Nugget Enterprises, of which you were a member, had additional income in the year ended December 31, 1958 * * * by reason of the disallowance of excessive rental in the amount of $15,000.00 as it is determined that a reasonable rental for the property [described above] * * * is $30,000.00 and not $45,000.00 as claimed on the partnership return of income of Nugget Enterprises. * * * The amounts paid by the Challenger to Nugget Enterprises and by Nugget Enterprises to the Graves Children Trust No. 1 during the years before us pursuant to the lease and sublease discussed above were not in excess of a reasonable rent for the property and were paid as rent. Twin Falls transferred its principal place of business to Carson City, Nevada, where it leased from Ella Broderick certain premises and contents known as the "Broderick Building." This lease was for five years from February 10, 1954, at $700 per month, with an option in Twin Falls to renew for an additional five years upon the same conditions. Twin Falls had an option to purchase the property for $75,000. The lease forbade alterations *21 or improvements without the lessor's written consent (but did not require Twin Falls to restore the property to its original condition), required the surrender of the premises at termination of the lease "in as good condition as reasonable use and wear thereof will permit," required the original inventory of personalty to be returned or replaced at termination, and forbade the unsightly removal of any fixture, decoration, or other improvement. On March 17, 1954, Twin Falls began a casino operation (the Carson City Nugget) on these premises. The lease of the Broderick Building was not amended when Graves sold the Twin Falls stock to Carson City Nugget, Inc. In May 1954, Caldwell purchased the Gabler Building, corner property adjoining the Broderick Building, for $45,053.77. Beginning June 1, 1954, Twin Falls rented the Gabler premises from Caldwell for $1,400 per month - a total of $16,800 in each of Twin Falls' taxable years 1955 and 1956. The lease was for five years with an option to renew for an additional five years. On September 10, 1956, Twin Falls and Caldwell entered into a new lease at a $500 per month rent to run until February 9, 1959, with an option to renew on the same *22 conditions for a five-year term. Twin Falls had a further option to renew for an additional five years at a renegotiated rent. In addition, Twin Falls had an option, exercisable only during the last month of the first five-year term or the first year of the second five-year term, to purchase the property for $50,000. Respondent determined that $900 per month of Twin Falls' payments to Caldwell under the 1954 lease was not an ordinary and necessary business expense. On July 5, 1954, Waldorf leased from E.W. and Nita H. Miller other premises, known as the Miller Building adjoining the Broderick Building. The rent was $250 per month and Waldorf had options to renew the lease for an additional five-year term and to purchase the property for $55,000. Waldorf was obligated to restore the leased property at the termination of the lease to the condition it was in at the commencement of the lease. On July 1, 1954, Waldorf subleased the Miller Building to Twin Falls for $850 per month, a total of $10,200 in each of Twin Falls' taxable years 1955 and 1956. Twin Falls was not required to restore the premises at the end of its sublease. When the premises were subleased by Waldorf to Twin Falls, *23 a section of the structural wall separating the Miller Building from the Broderick Building was removed and a beam installed to carry the roof structure. In addition, a number of partitions were placed in the Miller Building. An agreement between the Millers and Waldorf was entered into on September 18, 1956, releasing those parties from their obligations under the July 5, 1954, lease. On September 10, 1956, the Millers leased the Miller Building to Twin Falls for a period expiring February 10, 1959, at $250 per month with an option to renew for five years at $350 per month and for a further five-year term at a rent to be determined. The lease also contained an option, exercisable until February 10, 1959, to purchase the property for $55,000. The lease forbade structural changes without prior written consent by the lessors. It noted Twin Falls' intention to open a portion of the wall between the leased property and the Broderick Building and provided: "In the event that the option to purchase granted by these presents be not exercised, the LESSEE shall at the end of the term hereof close any opening made in any wall of the building on the demised premises in such manner that said wall *24 will be substantially the same as it now is." On September 18, 1956, the Millers consented to an assignment by Twin Falls to Carson City Nugget, Inc., of Twin Falls' rights under the September 10 lease. $500 per month of Twin Falls' $850 per month payments to Waldorf under the 1954 sublease was not paid as rent. Twin Falls obtained kitchen and dining room equipment, a terrazzo floor, air conditioning equipment, sinks, and other equipment under four contracts in the form of lease agreements. A characteristic of these agreements was that the amount paid in the first year or two by Twin Falls approximated the purchase price of the property to the ostensible lessor. Each lease provided for renewal options in Twin Falls for one-year terms, as follows: Total to beNo. ofAnnualNo. of Succes-Paid -MonthlyPaymentsive Renew-OriginalInstall-Install-for Re-al OptionsLease No.TermmentsmentnewalPermitted1$57,064.5624$2,377.69$500.2423210,090.4412840.8790.172433,122.5212260.2127.9024423,534.1624980.59205.8823 Twin Falls paid $36,179.59 during its taxable year 1955 and $64,348.31 during its taxable year 1956 under these agreements. These agreements were negotiated by Graves with Ternan Clauson and *25 Co., Inc. (hereinafter sometimes referred to as "Ternan Clauson") of Los Angeles but were entered into with W. S. Miller & Co., Inc., of Beverly Hills, California. Graves selected merchandise or equipment that he wanted directly from the vendors of such equipment and had the invoices sent to Ternan Clauson. In some manner unknown to Graves, the role of Ternan Clauson in the agreements was transferred to W. S. Miller & Co., Inc.Graves had no direct contact with W. S. Miller & Co., Inc. The Bank financed the acquisition of the equipment by lending the money to Ternan Clauson. The agreement was prepared by the Ternan Clauson legal department and the payments due were assigned to the Bank at the time of execution. Graves furnished the Bank with additional security for the loans in the form of personal insurance policies. Twin Falls was neither the insured nor the beneficiary of those policies. The agreements were leases in form only and the payments thereunder were payments for the acquisition of an equity in the property covered thereby. When Graves was negotiating to sell his Twin Falls stock in 1956, the purchasers demanded clear title to the equipment. Twin Falls paid Ternan Clauson *26 $7,000 on or about September 11, 1956, for such clear title. This payment was made for acquisition of title in the same manner as the payments under the "leases." The items subject to the Ternan Clauson leases are described in exhibits 56 through 60. They were acquired in 1954 and 1955. No depreciation deductions were claimed for these items in Twin Falls' returns. On petition, Carson City Nugget, Inc., claims in the alternative the right to deduct depreciation on these items on the double declining balance or sum of the years' digits methods. At trial and on brief, petitioners claim the right to use the double declining balance method. The parties have stipulated that: payments for the items described in exhibit 60, summarized as "Supplies" in exhibit 59, are to be treated as current business expenses; the remaining items (except the terrazzo floors and the V & T Decor) described in exhibit 59 had useful lives as set forth in that exhibit; the items (except the first item) described in exhibit 57 and (except the last item) exhibit 56, page 1, had useful lives of four years; and the items described in exhibit 58 had useful lives of five years. Respondent determined that: the items *27 (except the last item) described in exhibit 56, page 1, had a collective salvage value of $700; the first two items described in exhibit 56, page 2, had no salvage value and had useful lives of five years; the remaining items described in exhibit 56 (power panel, neon signs, and air conditioning system) had no salvage value and had useful lives of 113 months; the first item described in exhibit 57 had no salvage value and had a useful life of 110 months; the remaining items described in exhibit 57 had a collective salvage value of $240; the items described in exhibit 58 had a collective salvage value of $300; the terrazzo floors described in exhibit 59 had no salvage value and had a useful life of 103 months; the "V & T Decor," described in exhibit 59 had a salvage value of $771.32, equal to its cost; and the remaining items described in exhibit 59 had a collective salvage value of $1,228.68. In addition to its expenditures under the Ternan Clauson leases for the following items: Respondent'sDeterminationsAcquisitionListedDateUseful LifeItemCostPower panel$ 2,0009- 7-54113 monthsAir conditioning30,587Neon signs8,00012- 7-54110 monthsNeon sign tower with bea-con6,8007-10-55103 monthsTerrazzo floors2,100$49,487*28 Twin Falls also made the following leasehold improvements: Respondent'sDeterminationRespondent'sas toTwin Falls'DeterminationAcquisitionEstimatedas toDateItemUseful LifeUseful LifeCost3-31-54Center building60 mos.113 mos.$ 6,586.87improvements5-31-54Corner building60 mos.113 mos.2,286.69improvements7- 1-54Carpeting60 mos.2,150.008- 1-54Bldg. improvements60 mos.113 mos.12,443.279- 1-54Bldg. improvements60 mos.113 mos.13,535.5310-31-54Electrical work and60 mos.111 mos.1,350.60plans11-30-54Dining room, slot60 mos.110 mos.1,879.00repair room4- 1-55Decorations60 mos.106 mos.2,023.545-31-55Architect's fees48 mos.104 mos.673.306-30-55Building round house48 mos.103 mos.16,069.536-30-56Remodeling and30 mos.91 mos.10,534.11theater bar$69,532.44 Each of Twin Falls' leases of real property from the Brodericks, Waldorf, and Caldwell was for a period of five years plus a five-year renewal option and an option to purchase. Caldwell, the Pub, Saratoga, and Waldorf, during the period 1954 to 1959, maintained separate books and records (including minutes of annual directors' and stockholders' meetings), had their offices in an attorney's office in Carson City, Nevada, and had no employees apart from *29 Graves. Opinion Issue 1. Slot Machine Rent - Deductions In the deficiency notice to the Challenger, respondent described the adjustment here at issue as "Reallocated income and deductions." In the "EXPLANATION OF ADJUSTMENTS" section of the deficiency notice, respondent set forth his reliance upon sections 61, 269, and 482. 3*30 No mention was made of section 162(a). 4*31 In his answer, respondent admitted that he was disallowing the Challenger's slot machine rent deduction "through the form of allocating to and taxing to the petitioner the income of those corporations," i.e., the Pub, Saratoga, and Waldorf. In his opening statement respondent's counsel stated that "The case is somewhat complicated by a more sophisticated approach taken in the ninety day letter, that of imputing the income to The Challenger." His view at trial was that the Challenger's slot machine rent payments to the Pub, Saratoga, and Waldorf were not deductible because not ordinary or necessary. On brief, respondent argues that the payments were unreasonable and not ordinary or necessary business expenses and, alternatively, that the deduction may be disallowed under section 482. Petitioners assert that the slot machine rent arrangements were entered into for business, not tax avoidance, purposes and that the terms of the slot machine leases were fair. We agree in large part with respondent. A prima facie case for rent deduction may normally be made out through persuasive evidence that the property in question was used in the taxpayer's trade or business and that the disputed payments were made pursuant to an effective lease of that property. Anderson Dairy, Inc.39 T.C. 1027, 1043-1044 (1963), on appeal C.A. 9, September 11, 1963. See Sprague Electric Co., 36 T.C. 1043, 1083 (1961); Leon Papineau, 28 T.C. 54, 57 (1957). However, when lessor and lessee are owned by the same individual and respondent has determined the "rent" to be unreasonable, then the lessee must go further in order to carry its burden of persuading us that the amounts paid were really intended to be rent. Roland P. Place, 17 T.C. 199, 203 (1951), and cases there cited, affd. 199 F. 2d 373 (C.A. 6, 1952); Utter-McKinley Mortuaries v. Commissioner, 225 F. 2d 870, 872-873*32 (C.A. 9, 1955), affirming a Memorandum Opinion of this Court dated July 17, 1953; J. J. Kirk, Inc., 34 T.C. 130, 137 (1960), affd. 289 F. 2d 935 (C.A. 6, 1961). Also, when respondent has determined that an allocation of income or deductions is necessary in order to prevent evasion of taxes or clearly to reflect the incomes of the relevant entities, then such determination may not be set aside unless it is shown to be arbitrary and unreasonable. Nat Harrison Associates, Inc., 42 T.C. 601, 621 (1964); Grenada Industries, Inc. 17 T.C. 231, 255 (1951), affd. 202 F. 2d 873 (C.A. 5, 1953); National Securities Corporation, 46 B.T.A. 562, 565 (1942), affd. 137 F. 2d 600, 602 (C.A. 3, 1943). Without incurring any of the usual obligations of a slot machine lessor, except for the $12,500 cost of the machines, the Pub, Saratoga, and Waldorf received more than $420,000 during 4 1/2 years. The leases could be cancelled on thirty-days' notice. Nevertheless, the Challenger continued the leases on terms substantially unfavorable to itself. 5*33 See Warren Brekke, 40 T.C. 789, 800 (1963), on appeal, C.A. 9, March 24, 1964.Petitioners introduced schedules purporting to show that the Challenger received as much net income under the slot machine leases as it would have received under the usual 50-50 arrangement. There also was testimony to the effect that a slot machine lessor would normally expect to receive, after payment of license fees and costs of repair and maintenance, 15 to 20 percent of the net. If a 50 percent net profit is standard for a casino owner who takes no risk of loss and is spared the burdens of maintaining, repairing, and procuring licenses for the machines, we fail to believe that a casino owner who has assumed such burdens would be satisfied *34 with such a net profit. And if 15 to 20 percent is standard net profit to a slot machine lessor who has assumed the risks and burdens, we find it difficult to believe that an arm's-length negotiation could produce such a profit to a lessor who did not assume such risks and burdens. See Mandel Brothers, 4 B.T.A. 341, 353 (1926). No convincing explanation has been given for such uneconomic behavior. Petitioners' expert witness testified that in his opinion the Challenger's slot machine leases were reasonable. However, he conceded that he had not, in twenty years of leasing slot machines, entered into such an arrangement. His own testimony about the leases he himself had entered into, the usual practice in slot machine leasing in Nevada at the time, and the propensity of large casinos to acquire their own machines all tend to contradict his opinion evidence on this point. Further, he conceded that he did not know or had only vague ideas about a number of the elements that he testified were necessary to a determination of the reasonableness of the leases. Under these circumstances, we decline to give great weight to his statement that such a lease arrangement as we face here was reasonable. *35 See Tripp v. Commissioner, - F. 2d - at p. 94,086; C.A. 7, October 23, 1964), affirming a Memorandum Opinion of this Court. We conclude, on the basis of our findings of fact, that some part of the amounts paid by these related parties under the slot machine rent agreements was not required to be paid for the use of the slot machines and that respondent did not err in determining that some part of the Challenger's rent deductions should be reallocated back from the other commonly controlled corporations in order clearly to reflect the income of each corporation. However, this determination does not dispose of the issue. In the deficiency notice, respondent purported to allocate back to the Challenger its entire rent payments less the depreciation taken by the Pub, Saratoga, and Waldorf. In effect, respondent treated the Challenger as owner of the slot machines which in form were rented from the Pub, Saratoga, and Waldorf. This treatment conflicts with respondent's position with respect to Issue 3, which depends upon a valid transfer of the slot machines to the Pub, Saratoga, and Waldorf. The record indicates that the latter three corporations owned the machines. Respondent does not *36 suggest that the Challenger's payments under the lease constituted, in whole or in part, payments for the acquisition of an equity in the slot machines. That Graves may have been motivated by tax considerations to cause those corporations, rather than the Challenger, to own the slot machines may affect our view of the bona fides of the lease terms, but it does not, on the record in this case, change the fact of separate ownership. See Seminole Flavor Co., 4 T.C. 1215, 1235 (1945) and cases there cited; Buffalo Meter Co., 10 T.C. 83, 89 (1948); Interior Securities Corp., 38 T.C. 330, 340 (1962); John F. Nutt, 39 T.C. 231, 248 (1962), on appeal, C.A. 9, July 11, 1963; Nat Harrison Associates, Inc., supra, at 620. Compare Royal Farms Dairy Co., 40 T.C. 172 (1963), on appeal, C.A. 9, October 1, 1963, with Warren Brekke, supra, and Catherine G. Armston, 12 T.C. 539 (1949), affd. 188 F. 2d 531 (C.A. 5, 1951). Since the Challenger needed the slot machines for use in its business and did not own the machines, some part of the amounts it paid would have been required to be paid as rent as a result of a hypothetical arm's-length negotiation. Thus, our task is to determine what a reasonable *37 rent would have been ( Royal Farms Dairy Co., supra, at 189; Potter Electric Signal and Manufacturing Co. v. Commissioner, 286 F. 2d 200, 202, 204 (C.A. 8, 1961), affirming a Memorandum Opinion of this Court; Limericks, Inc., 7 T.C. 1129, 1135 (1946), affd. 165 F. 2d 483 (C.A. 5, 1948)) or the extent to which the incomes of the Challenger and the other corporations were distorted by the slot machine lease arrangements. Pauline W. Ach, 42 T.C. 114, 126 (1964) on appeal, C.A. 6, August 10, 1964; Nat Harrison Associates, Inc., supra, at 618, 621-622. We have been given almost no information which would bear directly on these questions. This omission is in part due to the fact that arrangements of this sort apparently were not made at arm's-length. However, we must arrive at some result that can be expressed in monetary terms. Nat Harrison Associates, Inc., supra, at 622; Pauline W. Ach, supra, at 124. See Helevering v. Taylor, 293 U.S. 507, 515 (1935); Cohan v. Commissioner, 39 F. 2d 540, 542 (C.A. 2, 1930). The lessors of the slot machines assumed no obligations for maintenance, repair, the securing of licenses, and the like. Comparison of the costs for those items with *38 the lessor's investments in the slot machines persuades us that, for the usual lessor, the cost of the slot machines is the comparatively riskless part of his investment in the business. We have examined the record, including the amount respondent was willing to allow as depreciation on the slot machines. We conclude that a reasonable monthly rent under these circumstances was not more than $2.59 per slot machine. See Nevada Revised Statutes section 99.050 (1) (1957 revision, 1961 Supp.). Of course, the Challenger may not then be permitted to deduct depreciation on these machines. We reach the same result on this issue on the weight of the evidence whether we proceed under respondent's original section 482 allocation of slot machine income or under respondent's later position that the rental expense is to be disallowed under section 162. Consequently, we need not decide petitioner's contention that respondent's shift in position caused a shift in the burden of proof. With these modifications, on this issue we hold for respondent. Issue 2. Slot Machine Rental - Income If respondent is treated as proceeding under section 482 in allocating slot machine income to the Challenger, then corresponding *39 amounts reported as rent income by the Pub, Saratoga, and Waldorf 6 must be allocated away from those corporations. South Lake Farms, Inc., 36 T.C. 1027, 1042 (1961), affd. 324 F. 2d 837 (C.A. 9, 1963); Hawaiian Trust Company Limited v. United States, 291 F. 2d 761, 770 (C.A. 9, 1961); Chicago & North Western Railway Co., 29 T.C. 989, 999 (1958); Hypotheek Land Co. v. Commissioner, 200 F. 2d 390, 396 (C.A. 9, 1952), reversing on another point 16 T.C. 1268 (1951); Hearst Corporation, 14 T.C. 575, 577-578 (1950); General Industries Corporation, 35 B.T.A. 615, 617 (1937). Respondent insists that his primary position in Issue 1 is that the rent payments are to be disallowed because they were not ordinary and necessary expenses of the Challenger's trade or business. Section 162(a) (3). Respondent has not determined that the payments resulted *40 in receipts of any given category. He notes that the payments were received under a claim of right. He quotes from Herbert Davis, 26 T.C. 49, 56 (1956), to the effect that this Court need only determine if the payments were ordinary and necessary - if they were not, the deductions are disallowed and we need not determine what the payments were. Petitioners maintain that, if the payments are not deductible by the Challenger, then the receipts cannot be income to the Pub, Saratoga, and Waldorf. They argue that respondent must lose on this point under section 482 and should not be permitted to avoid that result by now invoking section 162, at least not where the payor and payees are all before the Court in the same case. They maintain that "the nature of any excess payment is completely indeterminate: it could be a gift, a contribution to capital, or an erroneous allocation of one taxpayer's income to another." None of these alternatives, petitioners say, results in taxable income to the recipients. We agree in general with petitioners. Receipt under a claim of right is an important criterion when the issue is whether or not the taxpayer can retroactively erase the receipt from income. *41 It is not relevant to the case before us, where we are concerned with a retoractive change in the character of an amount that was admittedly received under a claim of right. Herbert Davis, supra, involved only the lessee. Each of the categories of expenditure there (supra, at 56) suggested as being possible proper characterizations of the payments - "a gift, or a diversion of income, or * * * a sham" - would have resulted in the lessee being denied a deduction. It was unnecessary for us to proceed further and decide which type of nondeductible characterization should be affixed to the payments. Manifestly, where the recipients of the payments are also before us and the different possible characterizations would have different tax consequences to the recipients for years that are before us, we are not so free to cut short our examination. See Royal Farms Dairy Co., supra, at 188-189. The Code limits deduction of compensation payments to "a reasonable allowance." Section 162(a)(1). Denial of deduction for an unreasonable compensation expenditure is compatible with a conclusion that the expenditure nevertheless constituted compensation. Roehl Construction Co., 17 T.C. 1037, 1041 (1951); *42 Reynard Corporation, 30 B.T.A. 451, 454 (1934). We have often noted the difference in phraseology between paragraphs (1) and (3) of section 162(a). The Code does not limit the rent payment deduction to "a reasonable allowance" as in the case of salary or compensation. We have inferred from this difference that deduction for a "rent" payment for property used in the taxpayer's business but not owned by the taxpayer will be denied only if we conclude that the payment did not constitute rent. Royal Farms Dairy Co., supra, at 187-188; Anderson Dairy, Inc., supra, at 1043; Potter Electric Signal and Manufacturing Co. v. Commissioner, supra, at 202-203; J. J. Kirk, Inc., supra, at 139; Roland P. Place, supra, at 203; Stanley Imerman, 7 T.C. 1030, 1037 (1946). We are left, then, with a conclusion that the Challenger paid to the Pub, Saratoga, and Waldorf amounts of money which were not in fact rents, even though all four corporations treated them as such. Our inquiry is now directed to the tax character, to the recipients, of those payments. Graves acquired all of the Challenger's outstanding stock prior to the inception of the slot machine leases and continued to be the Challenger's *43 sole shareholder throughout the period before us. It would be absurd to suggest that Graves was a straw man, merely a dummy titleholder of the Challenger's entire stock and that the latter was really owned by the Pub, Saratoga, and Waldorf. It follows that the slot machine "rent" payments were not dividend distributions from the Challenger to the three recipient corporations. Section 301(a). We note in this connection that respondent does not treat these payments as dividends, since he would include the entire slot machine receipts in the recipient corporations' incomes without allowance of the intercorporate dividends-received deduction. Section 243(a). Nor were these payments made to purchase the slot machines. Each year's payments were several times the stipulated fair market value of the slot machines. Once again, respondent seeks to include the entire receipts as ordinary income and makes no allowance for recoupment of basis or capital gains deduction. Finally, the excess "rent" payments do not appear to be compensation. Indeed, respondent often stresses the absence of valuable consideration given by the Pub, Saratoga, and Waldorf for the payments under the leases. Having rejected *44 the taxpayers' original treatment of the Challenger's payments, we must reach a decision regarding the taxable nature of the receipts that is compatible with our decision regarding payments in these consolidated cases. Compare R. E. L. Finley, 27 T.C. 413 (1956), affd. 255 F. 2d 128, 134 (C.A. 10, 1958) and Ray H. Schulz, 34 T.C. 235 (1960), affd. 294 F. 2d 52 (C.A. 9, 1961) with Commissioner v. Greenspun, 156 F. 2d 917 (C.A. 5, 1946), reversing a Memorandum Decision of this Court dated April 12, 1944, and Zeunen Corporation v. United States, 227 F. Supp. 952, 955 (D. Mich., 1964). Our findings are consistent with a conclusion that either: (1) for purposes of tax law the excess payments were in some fashion a nullity, as suggested by petitioners, giving rise to neither deductions nor taxable income; (2) the excess payments constituted capital contributions by the Challenger to the other three corporations (See Veterans Foundation, 38 T.C. 66 (1962), affd. 317 F.2d 456 (C.A. 10, 1963)); or (3) the excess payments constituted constructive dividends to Graves from the Challenger followed by constructive capital contributions by him to the other three corporations. See Montgomery Engineering Company, 230 F. Supp. 838, *45 (D.N.J., 1964). In any of these events the receipt by the three corporations of the excess payments would not constitute taxable income to those corporations. Section 118. We conclude, in light of the entire record and our decision on Issue 1, that the slot machine receipts are more likely to have constituted one of the described categories of nontaxable receipts, rather than any form of taxable income. The parties have stipulated the elements from which we may calculate the proper deductions for depreciation on the slot machines in the hands of the Pub, Saratoga, and Waldorf. We have determined, in connection with Issue 1, supra, what part of the Challenger's payments constituted rent. These agreements and determinations will be given effect in the Rule 50 computation and there will be eliminated from the incomes of the Pub, Saratoga, and Waldorf those amounts which we have determined not to be rent. Except to the extent indicated above, on this issue we hold for petitioners. Issue 3. Surtax Exemptions. Respondent determined in the deficiency notices that, under sections 269, 482, and 1551, the Pub, Saratoga, and Waldorf were not entitled to surtax exemptions for the years before *46 the Court because slot machine income had been diverted to those corporations from the Challenger in order to use those corporations' surtax exemptions. (a) Section 1551. 7*47 Four elements must exist before a surtax exemption may be disallowed under this section: 1. a transfer of property other than money by a corporation to the taxpayer; 2. the transferee was created for the purpose of acquiring this property or the transferee was not actively engaged in business at the time of the acquisition; 3. the transferor or its stockholders or both controlled the transferee during any part of the taxable years at issue; and 4. the transferee has failed to establish by the clear preponderance of the evidence that the securing of its surtax exemption was not a major purpose of the transaction. In his opening statement, respondent's counsel described the surtax exemption disallowance solely by a parenthetical reference to it as "part of the respondent's sophisticated approach to the problem of the multiplicity of corporations," i.e., the section 482 approach to Issue 1. On brief, respondent maintains that the Pub, Saratoga, and Waldorf were not actively engaged in business at the time of their acquisition of the slot machines. On reply brief, respondent adds that the Challenger transferred the slot machines to those three corporations. Petitioners *48 insist that the three corporations were not dormant prior to their acquisition of the slot machines; that the slot machines were not acquired by the three corporations from the Challenger; and that the acquisition was for business reasons. We agree with respondent as to the Pub, but agree with petitioners as to Saratoga and Waldorf. We have found that Kelley transferred the slot machines to Saratoga and Waldorf in satisfaction of obligations assumed by him in buying out their interests in Nugget, Inc. Kelley held no interest in either the Challenger, Saratoga, or Waldorf. Nothing in the record suggests that the Challenger ever acquired the machines and then turned them over to Saratoga and Waldorf. There is no suggestion that any other property was transferred to Saratoga or Waldorf in a manner relevant to section 1551. We conclude that the latter two corporations have shown that the first and third requirements for disallowance under section 1551 have not been met. Since the disallowance requirements under section 1551 are cumulative ( Bush Hog Manufacturing Co., Inc., 42 T.C. 713, 726 (1964); Hiawatha Home Builders, Inc., 36 T.C. 491 (1961)) and two requirements apply neither to *49 Saratoga nor to Waldorf, section 1551 does not authorize disallowance of their surtax exemptions. Kelley also transferred 40 slot machines to Caldwell, which in turn transferred them to the Pub. Graves' ownership of both Caldwell and the Pub causes the latter transfer to satisfy both the first and the third of the four requirements set forth above. The fact that the transfer took the form of a sale rather than a contribution to capital does not make section 1551 inapplicable. See Hiawatha Home Builders, Inc., supra, at 498. From about 1951 until its entry into the Westerner Club, the Pub did not engage in business. The Pub's investment in the Westerner Club was bought out on January 17, 1955. The slot machine transfer from Caldwell to the Pub did not occur until February 1, 1955. We have concluded that the Pub was not actively engaged in business at the time that Caldwell transferred the slot machines to it. Accordingly, the second of the above-listed requirements for disallowance of the Pub's surtax exemption has also been satisfied. The statute imposes upon the Pub the burden of establishing "by the clear preponderance of the evidence" that the securing of a surtax exemption was *50 not "a major purpose" of the transfer of slot machines from Caldwell to the Pub. The only explanation advanced for this transfer was that Caldwell needed cash at that time and the Pub either had the cash or was about to receive it on account of the liquidation of its interest in the Westerner Club. Caldwell's need for the cash early in 1955 is supposed to have arisen from its purchase of the Gabler Building in Carson City in May 1954. According to Graves' testimony, Caldwell had to make payments on the purchase price early in 1955. This explanation of the purpose for the transfer of slot machines on February 1, 1955, is effectively refuted by the Pub's and Caldwell's books, which show that (1) Caldwell loaned a total of $22,000 to the Challenger on January 10 and February 11, 1955, indicating that Caldwell did not need the $5,000 for which it sold the slot machines to the Pub; (2) the Pub paid out substantially all of its Westerner Club receipts on January 14 and 19, 1955, indicating that the Pub did not have enough remaining from the Westerner Club to pay for the slot machines; and (3) the Pub did not pay Caldwell for the slot machines until November 10, 1955. We do not believe Graves' *51 explanation that he merely overlooked until November payment for a transfer whose only asserted justification was the provision of cash to the transferor the preceding spring. As our findings show, from the time the Pub disposed of its Westerner Club interest until the formation of Nugget Enterprises, the Pub had no source of income other than the Challenger slot machine lease. On the other hand, Caldwell had income beginning June 1, 1954, from the rent it charged Twin Falls for the Gabler Building. At the time of Caldwell's transfer of slot machines to the Pub, it could have been expected that more of the slot machine rent would have been subject to surtax exemption in the Pub's hands than in Caldwell's hands. The Pub has failed to prove the absence of a major purpose to secure surtax exemption. Cf. Marne S. Wilson, 42 T.C. 914, 923-925 (1964). Consequently, all four disallowance requirements under section 1551 have been met as regards the Pub. We hold that respondent correctly disallowed under section 1551 the surtax exemption of the Pub, but not those of Saratoga and Waldorf. (b) Section 269. 8*53 On reply brief, respondent states his position: That the revival of dormant corporations *52 for use in entirely different circumstances with funds borrowed from related entities, as was done here, is the equivalent of the "acquisition" of the corporations under section 269 of the Internal Revenue Code of 1954. Petitioners argue that: the principal purpose of the slot machine acquisition and lease arrangement was "to start a casino with limited resources, and no one was looking head to income tax savings;" section 269(a)(2) does not apply because the slot machines were acquired by purchase and so there was no carryover basis; Graves' acquisition of control of the corporations long antedated the slot machine arrangements and so clearly could not have been motivated by a principal purpose to avoid taxes by improper use of those arrangements; the corporations were not dormant prior to the slot machine leases; and a revival of a dormant corporation is not equivalent to an "acquisition" under section 269. We agree with petitioners' reading of section 269. Respondent's statement of position indicates his reliance upon paragraph (1), rather than paragraph *54 (2), of section 269(a). Section 269(a)(1) requires acquisition of "control," not acquisition of the corporation. Congress undertook to define "control" for these purposes in terms of stock ownership. See Pauline W. Ach, supra, at 128. The revival of a dormant corporation does not constitute the acquisition of ownership of stock. Section 269 is essentially a re-enactment of section 129 of the Internal Revenue Code of 1939, added by section 128 of the Revenue Act of 1943. The Senate Finance Committee Report stated (Sen. Rept. 627, 78th Cong., 1st Sess., 1943, p. 60): Control once acquired could not be again acquired, unless the group was in some way broken. A mere shift in the form of control - from direct to indirect, from indirect to direct, or from one form of indirect to another form of indirect - cannot, therefore, amount to acquisition of control within the meaning of [section 129]. Since Graves owned the requisite percentage of shares to constitute control before the corporations entered Nevada, and this control was not broken prior to the transfer of slot machines, there could not have been an acquisition of control when the corporations entered into the slot machine arrangements. *55 Respondent would require us to determine when a corporation is deemed "dormant" and when it is "revived" within the meaning of section 269. Of course, neither word appears in the section. Respondent does not assist our effort to define these terms. Involvement in slot machine leases with the Challenger does not appear to be such a change in level of activities that it would satisfy any reasonable definition of respondent's "revival of dormant corporations" test. Respondent notes that we have held that section 269 authorizes disallowance of tax benefits to acquired as well as acquiring corporations and that incorporation will constitute an acquisition of control under section 269. He invites us to extend these decisions further and rule that revival will also constitute such an acquisition. In the cases referred to by respondent, Commissioner v. British Motor Car Distributors, Ltd., 278 F. 2d 392 (C.A. 9, 1960), and James Realty Company v. United States, 280 F. 2d 394 (C.A. 8, 1960), the taxpayers had control (as defined in the statute) of corporations after the acquisitions and did not have control, as so defined, before the acquisitions. Here, Graves controlled the corporations *56 before the slot machine arrangements and controlled the same corporations after the arrangements were entered into. Those cases relied upon by respondent thus differ from this one in a way that the statute makes decisive. The deficiency notices, opening statement, and reply brief make it clear that respondent is concerned in this issue with diversion of slot machine revenue from the Challenger to the other corporations. Our decision in Issue 1 transfers back to the Challenger substantially all of what respondent claimed was being diverted. Consequently, neither Graves nor petitioners have received a tax benefit from the slot machine arrangement. Section 269 is not an all-purpose provision. Even tax-motivated transactions must take certain forms before that provision can apply. See John F. Nutt, supra, at 250, acq. 1964-11 I.R.B. 5. We hold that the surtax exemptions of Saratoga and Waldorf may not be disallowed under section 269. (c) Section 482. Respondent contends that the "credits and allowances" which he may allocate under section 482 includes the surtax exemption. Petitioners dispute this understanding of section 482. They aver that in any event section 482 authorizes only *57 allocations and that respondent has disallowed, but not allocated, the surtax exemptions. We agree with petitioners. The short answer to respondent's contention is that he has not allocated the surtax exemptions of Saratoga and Waldorf to some other organization, trade, or business, he has merely disallowed them. In contrast to sections 269 and 1551, section 482 does not authorize disallowances, it authorizes only distributions, apportionments, and allocations. See Issue 2, supra. Respondent maintains that the predecessors of sections 482, 269, and 1551 "were to perform parallel functions in the frustration of tax avoidance schemes through application of the allocation power." He cites statements in several congressional committee reports indicating that those provisions were all expected to be useful in multiple corporation problems. We agree. Our recent decisions in Hamburgers York Road, Inc., 41 T.C. 821 (1964), and Bush Hog Manufacturing Co., Inc., supra, illustrate the nature of this parallelism. Respondent argued in those cases that the entire taxable income of one corporate petitioner was properly taxable to the other corporate petitioner under section 482. Our agreement *58 with this position in Hamburgers York Road, Inc., made it unnecessary to reach respondent's alternative determination in that case, that one surtax exemption should be disallowed under sections 269(a) or 1551. 41 T.C. at 840. In Bush Hog, respondent's surtax exemption argument under sections 269 and 1551 was clearly presented as an alternative to his effort to reallocate income under section 482. 42 T.C. at 724, 725. Here respondent has reallocated to the Challenger only part of the income of the slot machine rental recipients. We have upheld that determination almost in entirety. To the extent that this reallocation reduced the recipients' incomes below $25,000, it reduced the value of their surtax exemptions. That is the extent to which respondent can achieve his intended results under section 482. Our incidental comments in Kessmar Construction Co., 39 T.C. 778, 796 (1963), affd. 336 F. 2d 865 (C.A. 9, 1964), in which respondent made substantially the same arguments that he makes here, were intended to recognize the fact that a reallocation of all net income from one profitable corporation to another under section 482 may accomplish the same monetary result as a disallowance *59 of surtax exemptions under section 269. Those comments were not intended to indicate that section 482 may be authority for direct disallowance of a surtax exemption. Respondent contends, further, that since the Challenger, the Pub, Saratoga, and Waldorf "are in reality one entity they are entitled to but one surtax exemption." This view that the latter three corporations are not separate taxable entities is obviously inconsistent with respondent's effort, in this very issue, to increase the tax liabilities of each of those three corporations. See Hamburgers York Road, Inc., supra; Nat Harrison Associates, Inc., supra, at 618. We hold that respondent is without power to disallow surtax exemptions under section 482. On this issue, we conclude that respondent properly disallowed the Pub's surtax exemption under section 1551. We uphold Saratoga and Waldorf as to their surtax exemptions. Issue 4. Rent: Challenger, Nugget Enterprises On May 1, 1957, the Graves Children Trust No. 1 leased certain land in Sparks, Nevada, to the Challenger for ten years. Rent was fixed at $2,500 per month ($30,000 per year) for the first year and was then to be renegotiated. On September 23, 1957, that lease *60 was canceled and the Graves Children Trust No. 1 leased the same land to Nugget Enterprises for twenty years at $3,750 per month ($45,000 per year) for the first five years. Nugget Enterprises immediately subleased this land to the Challenger for ten years at $3,750 per month for seven months and $15,000 per month ($180,000 per year) thereafter. Nugget Enterprises spent almost $800,000 on the construction of a building on that property, which building was completed on May 12, 1958, nineteen days after the $15,000 per month sublease rental went into effect. Respondent determined that a fair rental payment by Nugget Enterprises for 1958 and by the Challenger for its taxable year ending September 30, 1958, would be $30,000 and in each case disallowed $15,000 of the rental deduction. On brief, respondent insists that the rents paid were excessive. 9 He states that, "The rent of a net of $11,250 a month, or $135,000 per year, to Nugget Enterprises, which the adjustments here would leave it, is a 17 percent return on the improvements of $796,000 and certainly fair and reasonable." Petitioners challenge respondent's authority to disallow deductions even for unreasonable rents "if they are *61 in fact rents" and they maintain that the rents here in question were in fact reasonable. The lease and sublease required Nugget Enterprises and the Challenger to pay the amounts deduction of which is here at issue. See Anderson Dairy, Inc., Sprague Electric Co., and Leon Papineau, all supra. Nugget Enterprises constructed on the leased property a new casino for the Challenger's use. These matters having been established, the close relationship of the lessor, lessee-sublessor, and sublessee require that we examine the reasonableness of the lease arrangements. The relationship does not require us to disregard the lease terms if we find those terms to be reasonable. E.g., Jos. N. Neel Co., 22 T.C. 1083, 1090 (1954); John F. Nutt, supra, at 248. Petitioners' expert testified that a reasonable rent *62 for the improved property during the period before us on this issue was $350,869 per year and for the same property unimproved was $72,000 per year. Respondent answers that the expert admitted there were no comparable properties in Sparks and that all the leases that the expert considered relevant were of Reno properties. Respondent urges that the differences between Reno and Sparks are such that no weight can be given to an effort to derive fair rental value in Sparks from downtown Reno statistics. However, the expert realized this difficulty and noted that his estimate of fair rent for the unimproved property was approximately one-fifteenth the prevailing rate per square foot for similar Reno properties. His estimate of fair rent for the property as improved by the sublessor was one-third the prevailing rate for Reno properties improved by the ultimate lessees and used as the Challenger used its premises. Respondent apparently concedes that the Challenger may properly deduct as rent amounts far in excess of the $30,000 per year deemed reasonable in the deficiency notice, since he states that a net rent of $135,000 per year is reasonable for the property in Nugget Enterprises' hands. *63 Further respondent's comment in his original brief that his adjustments would leave Nugget Enterprises with a net rent of $11,250 a month implies that if we uphold respondent's disallowance of part of the Challenger's rent deduction, then such amount is not to be included in Nugget Enterprises' income. 10*64 However, on reply brief, respondent denies any intention of allowing the payee of a disallowed rental to exclude the disallowed amount from its income. Respondent insists that such an exclusion could occur only if the disallowance were based upon section 482 and not upon section 162. See Issue 2, supra, and 5 and 6, infra. The interplay of the deficiency notices, the stipulated leases, and respondent's briefs leaves us with doubt as to what respondent's exact position is and as to whether respondent made any meaningful factual determination to which a presumption of correctness could attach. Respondent offered no rebuttal evidence nor has he shown any sufficiently substantial defects in the expert's testimony. Even without respondent's adjustments, Nugget Enterprises would have a net rent of $135,000 per year - $180,000 per year receipt from the Challenger minus $45,000 per year payment to the Graves Children Trust No. 1. Assuming, despite our expressed doubts as to the vitality for this issue of any presumption of correctness, that petitioners have the burden of proving the reasonableness of the rental payments we conclude on the record before us that they have sustained this burden. See American Metal Products Corp., 34 T.C. 89, 105-106 (1960), affd. 287 F. 2d 860 (C.A. 8, 1961). In view of the facts that the rent payments were required by the September 1957 lease, that the cancellation of the May 1957 lease served the Challenger's business needs in that it facilitated the construction of a new casino for the Challenger (cf. Ray's Clothes, Inc., 22 T.C. 1332, 1340 (1954); Consolidated Apparel Co. v. Commissioner, 207 F. 2d 580 (C.A. 7, 1953), reversing on *65 this point, 17 T.C. 1570 (1952)), and that the rent paid did not exceed a reasonable rent for that property, petitioners have shown that they are entitled to deduct the amounts claimed in this issue. On this issue we hold for petitioners. Issue 5. Rent: Twin Falls, Caldwell In 1954, Caldwell leased the Gabler property to Twin Falls for $1,400 per month. In 1956, when Carson City Nugget purchased Twin Falls, Caldwell and Twin Falls entered into a new lease for the same premises at $500 per month. Respondent has determined that deduction of the payments by Twin Falls under the 1954 lease must be disallowed to the extent of $900 per month, because to that extent the payments were "not an ordinary and necessary business expense." On brief he adds that the payments were "utterly excessive." Petitioners maintain that the rent was reasonable and also that the amounts were paid as rent and are, therefore, deductible whether or not they were reasonable. 11 Petitioners maintain in the alternative that if Twin Falls' rent deductions are disallowed in part, then Caldwell's rent income should be reduced to the same extent. Respondent replies that petitioners' alternate position is "an unprecedented *66 confusion of Section 482 and 162." We agree with respondent's determination as to Twin Falls. Petitioners' only evidence on this point is Graves' testimony that Carson City Nugget, Inc., insisted on the reduced rent as a condition to its purchase of Twin Falls. But Twin Falls' bona fide rent expense would have been currently deductible in full while Carson City Nugget, Inc.'s capital expenditure for the Twin Falls stock would be deductible only through depreciation in the event of a section 334(b)(2) liquidation. We doubt that a purchaser with the bargaining power Graves attributes to Carson City Nugget, Inc., would exert that power to increase its taxes. Such a purchaser would most probably *67 prefer to pay a higher rent (if bona fide and fully deductible) and pay a lower purchase price for the stock. On the other hand, a careful purchaser would be reluctant to pay what he regarded to be an exorbitant rent. (See Issue 7, infra.) Under these circumstances, petitioners' meager evidence on this point (compare Issue 4, supra) is not inconsistent with respondent's determination. Comparison of the option purchase prices of the Broderick ($75,000), Miller ($55,000), and Gabler ($50,000) premises with the arm's-length monthly Broderick rent of $700 and Miller rent of $250 (plus obligation to restore premises) further supports the reasonableness of respondent's determination that an arm's-length negotiation probably would have produced a Gabler monthly rent of no more than $500. Twin Falls has not shown that it was required to pay any amount greater than $500 per month for the use of the property. We conclude that respondent must be sustained in his disallowance of deductions for $900 per month of Twin Falls' lease payments to Caldwell. At trial, Caldwell moved for leave to amend its petition to claim, inter alia, that if respondent prevailed on this rent issue against Twin Falls, *68 then overpayments should be determined for Caldwell's taxable years 1956 and 1957. The proposed amended petition also requested a determination of an overpayment for Caldwell's taxable year ending in 1959. We granted the motion to amend "but only as it pertains to the fiscal year ended May 31, 1959," Caldwell's only year before us in this proceeding. Although Caldwell persists in raising this same matter on brief, there is neither evidence nor argument suggesting how the taxable nature to Caldwell of these receipts during its taxable years 1956 and 1957 might affect its tax for its only year before us. Section 6214(b). 12Since these payments have not been shown to affect any of Caldwell's tax years as to which we have *69 jurisdiction (see, e.g., Robert J. Dial, 24 T.C. 117, 125 (1955)), it is sufficient that we characterize the excess payments as not having been shown to be rent and it is not necessary that we determine their tax character to Caldwell. Herbert Davis, supra; Royal Farms Dairy Co., supra, at 188. Cf. Issue 2, supra. On this issue we hold for respondent. Issue 6. Rent: Twin Falls, Waldorf In 1954, Waldorf leased the Miller property from an unrelated party for $250 per month and then subleased it to Twin Falls for $850 per month. In 1956, when Carson City Nugget purchased Twin Falls, the lease and sublease were cancelled and Twin Falls leased the same property from the unrelated party for $250 per month. Respondent determined that deduction of the payments by Twin Falls under the 1954 lease must be disallowed to the extent of $600 per month, because to that extent the payments were "not ordinary and necessary business expenses." Petitioners' contentions and respondent's reply are as in Issue 5, supra. 13 We agree with respondent, in large part, as to Twin Falls. We also agree with Waldorf. Petitioners' only evidence on this point is Graves' testimony that *70 the $600 per month difference between the lease and sublease was intended to reflect the absence from the sublease of an obligation to restore the leased premises to their prior condition. Since the 1954 lease was to run for five years, Waldorf expected to receive from Twin Falls $36,000 more than it paid to the owner of the property during the term of the lease. Graves testified that the 1954 lease included an option to purchase the property for $55,000. Petitioners presented no evidence that the parties contemplated any particular level of reserves as being necessary to restore the leased premises. Even if we were to assume that the parties did not contemplate renewal of the 1954 leases, 14 we are not persuaded that the additional $600 per month was intended to have any relationship to Waldorf's obligation to restore the premises. We recognize that Waldorf's obligation plus a reasonable profit for the assumption of such obligation would justify a sublease rent greater than *71 the rent charged under the basic lease. We have little to indicate how much is thus justified. Using our best judgment based on the record as a whole, we have found that $500 per month of Twin Fails' payments under the sublease was not paid as rent. Waldorf was granted leave at trial to amend its petition to claim, inter alia, that if respondent prevailed on this rent issue against Twin Falls, then overpayments should be determined for Waldorf's taxable years 1956 and 1957. Petitioners do not dispute Waldorf's receipt of the payments under the lease. Prior to this proceeding, Waldorf treated the payments on its books and returns as rental income. Respondent did not disturb this position. At respondent's urging, we have found in this proceeding that the payments were not rent. For the reasons given in Issue 2, supra, we conclude that it is more likely than not that the payments constituted either a nullity for income tax purposes or some form of nontaxable receipt to Waldorf. In either event, Waldorf need not include in its income those payments by Twin Falls under the sublease of the Miller property, to the extent we have found the payments did not constitute rent. Except to the extent *72 indicated above, we hold for respondent as to Twin Falls' rent deduction and for Waldorf as to its income claim. Issue 7. Rent: Twin Falls, Ternan Clauson Respondent disallowed in their entirety Twin Falls' deductions of amounts paid to Ternan Clauson under leases of property used in Twin Falls' business. 15 Respondent determined that the payments constituted a cost of acquiring the property and allowed, instead, deductions of financing costs. Petitioners maintain that the leases were bona fide and that there was no intent to purchase the property until Carson City Nugget insisted upon such purchase as a condition of its acquisition of Twin Falls' stock. Petitioners alternatively insist, and respondent concedes, that Twin Falls is entitled to deduct allowances for depreciation or amortization on the property. We agree with respondent that Twin Falls' payments were capital in nature. The Ternan Clauson agreements were cast in the form of leases. The terms of the leases plus optional renewals amounted to 25 years in each case; none *73 of the properties had useful lives greater than ten years; some of the leased properties (e.g., the terrazzo floor) most probably could not have been removed by the "lessor" after installation; and the payments required by the leases after the initial one-or two-year terms were less than one-fiftieth of the rates for the initial terms. We conclude that the Ternan Clauson agreements were intended by the parties thereto to constitute sales contracts and not leases. See Estate of Delano T. Starr, 30 T.C. 856 (1956), affirmed on this point 274 F. 2d 294 (C.A. 9, 1959); Mt. Mansfield Television, Inc. v. U.S., - F. Supp. - (D. Vt., August 7, 1964). Twin Falls paid $7,000 in 1956 to remove the "lease" restrictions on title to the Ternan Clauson items. In the deficiency notice, respondent allocated this $7,000 "additional cost" among the Ternan Clauson items in proportion to figures which generally match the "cost" figures listed on exhibits 56 through 60. He then subtracted the resulting total "corrected cost" from the "Total to be paid per leases" (calculated according to the original terms of the leases, without renewals) plus the $7,000 less a $283.78 "Discount allowed for advance payment." *74 The remainder thus calculated was treated as a "cost of financing" and allowed as a deduction partly in Twin Falls' 1955 taxable year and the rest in Twin Falls' 1956 taxable year. Petitioners argue that if the Ternan Clauson agreements are treated as purchases, there is no legal difference between the $7,000 payment and the amounts respondent treats as currently deductible financing costs. Respondent maintains that the $7,000 was an additional cost of the property and not related to the financing. We agree with petitioners. The parties to the Ternan Clauson transactions arranged them in the form of leases. At respondent's urging, we have found that they constituted sales. Were we to agree to respondent's insistence that the label affixed by the taxpayer be changed, it would seem that the taxpayer "is entitled to the normal incident of the new label." Commissioner v. Wilshire Holding Corporation, supra, at 800., Starr's Estate v. Commissioner, 274 F. 2d 294, 296 (C.A. 9, 1959); Judson Mills, 11 T.C. 25, 33 (1948). See Clay B. Brown, 37 T.C. 461, 490-491 (1961), affd. 325 F. 2d 313 (C.A. 9, 1963), certiorari granted 377 U.S. 962 (1964). It appears that the $7,000 was required *75 by Ternan Clauson before it would transfer title to the property. The transfer of title permitted Twin Falls to avoid further payments under the leases. The $7,000 thus took the place of further payments under the leases and had no apparent relationship to any particular items. Respondent has determined that the payments in excess of cost are currently deductible. In agreeing with petitioner that this amount is to be added to the "cost of financing," we are merely extending the logic of respondent's otherwise reasonable basic approach. Anticipating the possibility of our determination that the Ternan Clauson leases amounted to sales, the parties entered into the stipulations described in our findings of fact, which will be given effect in the Rule 50 computation. We have upheld respondent's remaining determinations as to useful life and salvage value in the absence of persuasive contrary evidence. Although the parties take no note of it, the acquisition dates of the Ternan Clauson lease property listed in Exhibits 56 through 60 differ from the dates determined by respondent in Exhibits B and C to the deficiency notice in docket No. 90742. Respondent stipulated that Exhibits 56 through *76 60 listed the Ternan Clauson lease properties but there was no stipulation as to acquisition dates. Petitioners' accountant testified that he prepared Exhibits 56 through 60 from the detailed lists appended to the leases. We have examined the lists appended to the one lease introduced into evidence and note that in almost every case the acquisition dates of Exhibits 59 and 60 match the invoice dates listed in the lease attachments. We have no evidence as to the significance of the invoice dates. We do not know when Twin Falls received the property. We do know that most of the invoice dates do not coincide with the dates of the inception of the various leases. Since we must determine acquisition dates of the Ternan Clauson lease property (other than those described in Exhibit 60) in order to properly compute allowable depreciation or amortization and since we have no evidence persuasively refuting the acquisition dates determined by respondent, we direct that the Rule 50 computation will be made on the basis of the acquisition dates set forth in Exhibits B and C to the deficiency notice except that, as noted in our findings, the carpeting was acquired on July 1, 1954. Petitioners' expert *77 testified that his company would not make any trade-in allowance for the kitchen equipment described in Exhibit 56 but that Twin Falls might be able to realize something on a sale of such used equipment to another restauranteur. We do not understand his testimony to be significantly contrary to respondent's determination that this property had an aggregate salvage value equal to approximately 10 percent of its cost. Respondent's determination is upheld on this point. Graves testified that the air conditioning system (presumably the one described in Exhibit 56) would have a useful life of five years. He was not able to corroborate this estimate by supporting testimony of experts or by any data that we could evaluate. We must agree with his argument that an air conditioning system that ran 24 hours a day, as this one did, would have a shorter useful life than one that ran eight or nine hours a day. Since we do not know how long Twin Falls' air conditioner would be expected to be useful under the hypothetical eight-hour operation, this testimony does not help us to fix the useful life under the conditions that actually took place. Nor did he so demonstrate his credentials as an expert *78 that we must accept his opinions as establishing even a prima facie case for a useful life shorter than that determined by respondent. See Stevens Bros. Foundation, Inc., 39 T.C. 93, 124-125 (1962), affd. on this point 324 F. 2d 633, 647 (C.A. 8, 1963). Respondent's determination of a 113-month useful life is upheld. The same comments apply to Graves' testimony as to the neon signs. Respondent's determination is upheld on this point. Respondent's determination as to allowable depreciation or amortization involve determinations as to useful lives in the taxpayer's business. Where the useful lives of fixtures were determined to extend beyond the initial term of the lease, respondent must be treated as having determined that the lease would probably be renewed at least once. J. M. Perry & Co. v. Commissioner, 120 F. 2d 123, 124 (C.A. 9, 1941), affirming a Memorandum Opinion of this Court. Cf. Southern Ford Tractor Corporation, 29 T.C. 833, 841 (1958). Graves testified that, by October 1954, he had determined not to renew the leases, had investigated other possible places of business, and had in fact acquired property near the Carson City Nugget on which he intended to operate a *79 casino business. However, Graves' testimony related to his intentions and not to those of Twin Falls. True, Graves was Twin Falls' sole stockholder at the time. Nevertheless, Graves operated through corporations, joint ventures, and partnerships. The record indicates that he often entered into casino or similar operations and then withdrew after short periods of time. In this case, Graves withdrew from the Carson City Nugget by selling the Twin Falls stock and, until the trial, made no use of the land allegedly intended as the new site of Twin Falls' operation. During the less than 2 1/2 years between Twin Falls' opening of the Carson City Nugget and Graves' sale of the Twin Falls stock, Graves caused Twin Falls to spend almost $70,000 on leasehold improvements and to acquire, via the Ternan Clauson leases, additional leasehold improvements costing almost $50,000. Twin Falls treated all but one of these improvements as having useful lives extending past the initial term of the Broderick lease. Respondent determined that these improvements would have useful lives terminating not later than the expiration of the first renewal term of the Broderick lease. Under these circumstances, we *80 cannot say that petitioners have presented such substantial evidence as to Twin Falls' intentions, that they have carried their burden of persuading us that the Miller, Gabler, and Broderick property leases would not be renewed. See $ Westinghouse Broadcasting Co., 36 T.C. 912 (1961), affd. 309 F. 2d 279 (C.A. 3, 1962). Respondent computed allowable depreciation by the straight-line method. Petitioners maintain that Twin Falls is entitled, under the statute 16*82 and the regulations, 17*83 to compute depreciation by the double declining balance method, that they have never elected another method of computing depreciation as to these properties, that this proceeding is their first occasion to make such an election, that such election does not require respondent's approval, and that amortization is merely a form of depreciation. Respondent, on reply brief, argues that Twin Falls never elected on its returns to use the double declining balance method of depreciating the Ternan Clauson lease properties; that the useful lives of these properties extended past the renewal option period of the leases, therefore Twin Falls may not depreciate but may only amortize, and that amortization may be *81 deducted only by the straight-line method. 18*84 We agree with petitioners. As we understand the dates involved, respondent determined (and we have agreed) that the assets' useful lives do not extend past the expiration of the Broderick lease together with one probable renewal. Under the statute and the regulations (footnote 18, supra) Twin Falls is entitled to an allowance for depreciation under section 167 of its basis in the leasehold improvements here at issue. We need not determine, then, whether Twin Falls would be entitled to so treat these improvements if they had useful lives extending past the *85 termination of the renewed leases. See Tom F. Baker III, 38 T.C. 9 (1962), on the difference, if any, between amortization and depreciation. There remains to be determined the question of whether a proper election has been made to deduct depreciation on these items on the double declining balance method. 19Respondent has contented himself to argue, on reply brief, that Twin Falls has not made proper elections on its returns for the years involved. Neither the statute nor the regulations (with one exception) specifically require the election to be made on the taxpayer's return in order for the taxpayer to have the benefit of the double declining balance method of computing depreciation. As we have said, "An election normally implies a choice between two or more alternatives." John F. Bayley, 35 T.C. 288, 297 (1960). As in Bayley, the taxpayer here reported the transaction, but treated it as one governed by a different provision of the Code than the one that we, at respondent's urging, have held applicable. As in Bayley, Twin Falls *86 was not faced with the necessity of making the election until respondent determined that the transaction constituted a sale rather than a lease. See John P. Reaver, 42 T.C. 72, 81 (1964). On its original petition, Carson City Nugget, Inc., maintained in the alternative that "If the rental payments deducted by Twin-Falls Brunswick, Inc., as such in reality constituted the purchase price of property, then it elected a form of accelerated depreciation, which was more accelerated than either the sum of the years digits method or the declining balance method." This position was again stated in the opening remarks of petitioners' counsel. During the direct examination of Twin Falls' accountant, petitioners' counsel elicited the statement that Twin Falls was electing to depreciate on the double declining balance method the indicated items on Exhibits 56 through 59. This position was confirmed on brief. While we would have preferred more punctilio in this matter, nevertheless petitioners' position was made clear, respondent's objection goes only to whether the election may be made other than on the return, and respondent does not appear to have been hampered in any way by petitioners' piece-meal *87 election. We note that the relevant regulations (footnote 17, supra) were promulgated in T.D. 6182, June 11, 1956. They provided that elections or changes in elections for returns required to be filed on or before September 15, 1956, may be made in amended returns or claims for refund filed on or before that date. This provision applies only to the first of Twin Falls' three taxable periods forming the basis for alleged transferee liability in this case. As to that one year, we construe the last sentence of the regulation to be a relief provision, applicable to those who had already taken depreciation on the straight-line method or elected some other method. On this issue we hold for respondent as to the nature of the Ternan Clauson leases, the useful lives, salvage value, and acquisition dates of the property (except where indicated otherwise), and the probability of renewal of the realty leases and sublease. We hold for petitioners on the treatment of the $7,000 payment as additional financing costs and on Twin Falls' right to use the double declining balance method of computing depreciation on the property subject to the Ternan Clauson leases, except for the property described *88 in Exhibit 60. Decisions will be entered under Rule 50. Footnotes1. Proceedings of the following petitioners are consolidated herewith: Carson City Nugget, Inc., Docket No. 90742; The Pub, Inc., Docket No. 90743; Saratoga Club, Inc., Docket No. 90744; Caldwell Sport Shop, Inc., Docket No. 90745; and United Waldorf, Inc., Docket No. 90746.↩2. At trial, respondent conceded error in denying the surtax exemption to Caldwell, Docket No. 90745.↩3. All statutory references are to the Internal Revenue Code of 1954 unless indicated otherwise. SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. ↩4. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.5. Q. Did the time come when the Challenger was in financial position to buy the slot machines which oriinally it had leased in 1955 from the three corporations? A. [Graves] Yes; I suppose somewhere along the line that time came. Q. Were these agreements terminated, and did the Challenger at any time in the taxable years here involved buy these machines? A. No. Q. And why did it not terminate the leases and buy the machines? A. Well, we can - I believe it was just because we considered a deal a deal. The deal was made and it had been working out, the arrangements were satisfactory, and I just went along with it.↩6. The Pub, Saratoga, and Waldorf each reported income on fiscal years ending on dates different from those used by the Challenger. Since the "rent" accrued monthly and varied from month to month, the adjustment for any of the Challenger's taxable years would be different in amount from the adjustments for the other corporations' taxable years.↩7. SEC. 1551. DISALLOWANCE OF SURTAX EXEMPTION AND ACCUMULATED EARNINGS CREDIT. If any corporation transfers, on or after January 1, 1951, all or part of its property (other than money) to another corporation which was created for the purpose of acquiring such property or which was not actively engaged in business at the time of such acquisition, and if after such transfer the transferor corporation or its stockholders, or both, are in control of such transferee corporation during any part of the taxable year of such transferee corporation, then such transferee corporation shall not for such taxable year * * * be allowed * * * the $25,000 exemption from surtax provided in section 11(c) * * * unless such transferee corporation shall establish by the clear preponderance of the evidence that the securing of such exemption or credit was not a major purpose of such transfer. * * * This provision was amended effective for years subsequent to those before the Court, by Public Law 88-272, section 235(b), and Public Law 85-866, section 205(a).↩8. SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General. - If - (1) any person or persons acquired, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled directly or indirectly, immediately before such acquisitions, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation. This provision was amended effecive for years subsequent to those before the Court by Public Law 88-272, section 235(c)(2).9. Respondent does not suggest that the property was not used in the Challenger's or Nugget Enterprise's trade or business nor does he suggest that either of these entities had title to or equity in the property. His allowance of part of the rent deductions of both the Challenger and Nugget Enterprises constitutes an implicit concession that these requirements for deductibility have been met.↩10. Nugget Enterprises received $15,000 per month. If it may deduct only $2,500 per month of its payments to the Trust, per respondent's determination, then its net rental income would be $12,500 per month. It would appear that respondent's $11,250 per month was arrived at by reducing the Nugget Enterprises' $12,500 net by the amount of the disallowance applicable to the Challenger - $1,250 per month.11. The parties have stipulated that "During the fiscal years ended August 31, 1955, and August 31, 1956, [Twin Falls] paid $16,800.00 in each year to [Caldwell] and $10,200.00 in each year to [Waldorf] as rental for the use of the foregoing premises." In view of the contentions of the parties, we treat this as a stipulation that the amounts were paid pursuant to the terms of the leases and not as a concession that the entire amounts were paid as rent. Rule 31(b)(6), Tax Court Rules of Practice.↩12. SEC. 6214. DETERMINATIONS BY TAX COURT. * * *(b) Jurisdiction Over Other Years. - The Tax Court in redetermining a deficiency of income tax for any taxable year or of gift tax for any calendar year shall consider such facts with relation to the taxes for other years as may be necessary correctly to redetermine the amount of such deficiency, but in so doing shall have no jurisdiction to determine whether or not the tax for any other year has been overpaid or underpaid.↩13. See footnote 11, supra.↩14. The 1954 leases were not introduced. The 1956 lease ran to 1959, with provisions for two five-year renewal periods. See Westinghouse Broadcasting Co., 36 T.C. 912 (1961), affd. 309 F. 2d 279↩ (C.A. 3, 1962).15. At trial, respondent conceded that the Ternan Clauson rent disallowance of $36,179.59 for Twin Falls' taxable year 1955 should be reduced to $34,990.74.↩16. SEC. 167. DEPRECIATION. * * *(b) Use of Certain Methods and Rates. - For taxable years ending after December 31, 1953, the term "reasonable allowance" as used in subsection (a) shall include (but shall not be limited to) an allowance computed in accordance with regulations prescribed by the Secretary or his delegate, under any of the following methods: * * *(2) the declining balance method, using a rate not exceeding twice the rate which would have been used had the annual allowance been computed under the method described in paragraph (1), * * *(c) Limitations on Use of Certain Methods and Rates. - Paragraphs (2), (3), and (4) of subsection (b) shall apply only in the case of property (other than intangible property) described in subsection (a) with a useful life of 3 years or more - (1) the construction, reconstruction, or erection of which is completed after December 31, 1953, and then only to that portion of the basis which is properly attributable to such construction, reconstruction, or erection after December 31, 1953, or (2) acquired after December 31, 1953, if the original use of such property commences with the taxpayer and commences after such date. 17. § 1.167(c)-1 Limitations on methods of computing depreciation under section 167(b)(2), (3), and (4). * * *(c) Election to use methods. Subject to the limitations set forth in paragraph (a) of this section, the methods of computing the allowance for depreciation specified in section 167(b)(2), (3), and (4) may be adopted without permission and no formal election is required. In order for a taxpayer to elect to use these methods for any property described in paragraph (a) of this section, he need only compute depreciation thereon under any of these methods for any taxable year ending after December 31, 1953, in which the property may first be depreciated by him. The election with respect to any property shall not be binding with respect to acquisitions of similar property in the same year or subsequent year which are set up in separate accounts. If a taxpayer has filed his return for a taxable year ending after December 31, 1953, for which the return is required to be filed on or before September 15, 1956, an election to compute the depreciation allowance under any of the methods specified in section 167(b) or a change in such an election may be made in an amended return or claim for refund filed on or before September 15, 1956. 18. § 1.167(a)-4 ]Income Tax Regs.] Leased property. Capital expenditures made by a lessee for the erection of buildings or the construction of other permanent improvements on leased property are recoverable through allowances for depreciation or amortization. If the useful life of such improvements in the hands of the taxpayer is equal to or shorter than the remaining period of the lease, the allowances shall take the form of depreciation under section 167. See §§ 1.167(b)-O 1.167(b)-1, 1.167(b)-2, 1.167(b)-3, and 1.167(b)-4 for methods of computing such depreciation allowances. If, on the other hand, the estimated useful life of such property in the hands of the taxpayer, determined without regard to the terms of the lease, would be longer than the remaining period of such lease, the allowances shall take the form of annual deductions from gross income in an amount equal to the unrecovered cost of such capital expenditures divided by the number of years remaining of the term of the lease. Such deductions shall be in lieu of allowances for depreciation. See section 162 and the regulations thereunder. See section 178 and the regulations thereunder for rules governing the effect to be given renewal options in determining whether the useful life of the improvement exceeds the remaining term of the lease where a lessee begins improvements on leased property after July 28, 1958, other than improvements which on such date and at all times thereafter, the lessee was under a binding legal obligation to make. Capital expenditures made by a lessor for the erection of buildings or other improvements shall, if subject to depreciation allowances, be recovered by him over the estimated life of the improvements without regard to the period of the lease.19. It appears from the record, and respondent does not deny, that the other requirements [useful life, acquisition date] of section 167(c)↩ have been met.